UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Cause No. 1:22-CR-20 |
| | ) | |
| DEMETRIUS R. BOSTIC | ) | |

**BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS**

Comes now the United States of America, by its counsel, Clifford D. Johnson, United States Attorney for the Northern District of Indiana, through Anthony W. Geller, Assistant United States Attorney, and files this response brief. Demetrius R. Bostic has alleged that the search warrants for his residence and stash house were based on insufficient probable cause, but his brief largely ignored the deferential review standard and failed to consider the totality of the circumstances. The government responds that the issuing magistrate had a substantial basis for probable cause. If not, the warrants were nevertheless served in good faith.

*Summary of Affidavits*

On April 15, 2022, U.S. Magistrate Judge Susan Collins signed warrants authorizing searches for residences on Riley Place and Pine Meadows Lane in Fort Wayne, among other warrants.[1] The affidavit began with the expert qualifications of the affiant, Task Force Officer (TFO) Darren Compton of the Drug Enforcement Administration. (Aff. 1-2) TFO Compton has been a police officer for more than 28

[1] As Bostic's brief states, the affidavits were the same, except for the property descriptions. Because of this, the government will cite to the affidavits generally as "(Aff. [page number])."

years. (Aff. 1) He has worked for police departments in two states, and he has worked narcotics investigations for most of his career, for over 20 years, including 8 years as a drug TFO with FBI. (Aff. 1) TFO Compton has utilized every investigative technique available in drug trafficking cases, including wiretaps, every manner of surveillance, informants, GPS tracking, and so on. (Aff. 1-2)

In his introductory paragraphs, TFO Compton explained the basis for the applications, which was the ongoing drug trafficking activity of Bostic and his associates. (Aff. 3-4) These individuals were distributing and possessing with intent to distribute controlled substances and were using and maintaining a drug-involved premises, all in violation of 21 U.S.C. §§ 841 and 856. (Aff. 3) DEA and FBI were investigating this large criminal organization led by Bostic, which started supplying drugs as early as 2016 to gang members, and the affidavit discussed the organization's drug trafficking and money laundering operation. (Aff. 3-4)

To illustrate the money laundering, Bostic and his associates provided large amounts of cash to an undercover officer and informants over several months, and Bostic's associate, Jerry Watson, was caught with cash in June of 2021. (Aff. 4-12) On March 17, 2021, Bostic personally met an undercover officer in Indianapolis and provided the undercover with $136,000 cash. (Aff. 4) On April 6, 2021, Bostic's associate, Juan Carlos Picos-Ochoa, put a bag with $124,250 into an informant's vehicle. (Aff. 5-7) On April 29, 2021, Picos-Ochoa delivered $180,000 to an informant after meeting with Bostic at a hotel. (Aff. 8) On May 5, 2021, Bostic delivered $148,500 cash to an informant in a parking lot in Fort Wayne. (Aff. 9) On June 7,

2021, Watson was stopped with $169,520 after driving in tandem with Bostic. (Aff. 10-12) Bostic's organization therefore handled over $750,000 cash just from March through June of 2021.

Far more than solely handling lots of cash, Bostic engaged in common concealment tactics employed by drug traffickers. Bostic utilized at least four different cellular telephones, as seen by an undercover officer, and Bostic compartmentalized his drug trafficking by keeping a personal phone in addition to drug phones. (Aff. 4) Bostic engaged in tandem driving, and TFO Compton explained that drug traffickers commonly use this tactic to provide security for a drug shipment or load of drug money. (Aff. 8) If police or robbers were near, the follow vehicle was there to create a distraction to divert attention away from the load vehicle, with the hope of allowing the load vehicle to continue undetected. (Aff. 8, 20) Bostic commonly drove a black Ram pickup during this investigation, but the truck was registered to Jackie Shouse of Muncie, with drug traffickers often driving vehicles in someone else's name to hide their identities and to shield assets from forfeiture. (Aff. 38-40) Despite having personal access to vehicles, Bostic drove rental vehicles. (Aff. 9) Bostic drove circuitous routes to avoid areas with high police patrols. (Aff. 13) According to TFO Compton's training and experience, drug traffickers such as Bostic will utilize countersurveillance driving to detect police surveillance or potential robbers, including circling the block, turning around, turning onto side streets, and slowing down or stopping. (Aff. 16) Bostic also turned off his phone when engaging

in drug trafficking activity, which is commonly designed in TFO Compton's opinion to conceal the drug dealer's phone location while committing crimes. (Aff. 14, 17)

Regarding the money transfer on April 6, 2021, surveillance observed an unknown black male at one of Bostic's residences on Dado Drive in Noblesville at shortly before 1:00 p.m. (Aff. 5, 12) The man was driving a Buick registered to Annette Redfield in Fort Wayne, and he took something from the Buick and concealed it under his shirt as he entered Bostic's garage. (Aff. 5) He next obtained a black bag from a white GMC Yukon in the driveway, which was registered to Andrene Nicole Sinclair (Bostic's girlfriend as seen below) at the Riley Place residence. (Aff. 5) About an hour later after 2:00 p.m., surveillance observed Picos-Ochoa in a Chrysler Pacifica at the Dado Drive residence. (Aff. 5) Picos-Ochoa went into Bostic's garage empty-handed but exited with a brown duffel bag, placing it in the rear hatch of the Pacifica and possibly hiding the bag in the spare tire area. (Aff. 5)

Picos-Ochoa went to a residence on East Georgia Street in Indianapolis, which is where he would soon meet with an informant for a money transfer. (Aff. 6-7) A DEA confidential source (CS-1) said that their target requested to meet here, and about a minute later at 3:17 p.m., surveillance saw Picos-Ochoa exiting the Pacifica with a backpack, grabbing the brown bag from the rear hatch area, and entering the rear door of the residence with a key card through a back alley. (Aff. 5-6)

Another confidential source (CS-2) then met with Picos-Ochoa and obtained the money, and prior to the meeting, agents searched CS-2's person and vehicle, finding no contraband or money. (Aff. 6) CS-2 was equipped with a recording device,

and while CS-2 was heading to the meeting spot, CS-1 relayed at about 5:09 p.m. that Picos-Ochoa was on his way with $125,000. (Aff. 6) At about 5:18 p.m., surveillance observed Picos-Ochoa walking from the back of the Georgia Street residence with a yellow-green drawstring bag, placing this bag in the Pacifica. (Aff. 6) Picos-Ochoa got into CS-2's vehicle, and after driving together for a few minutes, Picos-Ochoa exited CS-2's vehicle and placed the drawstring bag into CS-2's vehicle. (Aff. 6-7) Agents later seized the bag and found that it contained $124,250 in cash. (Aff. 7)

A little over a week later on April 15, 2021, surveillance observed Bostic meeting with Picos-Ochoa in Indianapolis. (Aff. 7) After the meeting, Bostic drove his black Ram in tandem with a gold Mercedes from Indianapolis to Fort Wayne. (Aff. 7) Later in the afternoon, surveillance saw both vehicles together at the Riley Place residence, and the Mercedes was seen at Bostic's restaurant, the Lewis Street Grill. (Aff. 7-8, 13)

On April 29, 2021, surveillance watched Bostic leave the Dado Drive residence and drive his black Ram to a hotel in downtown Indianapolis. (Aff. 8) Carrying a black duffel bag, Bostic met with Picos-Ochoa, and they entered the hotel together. (Aff. 8) Two hours later, surveillance observed Bostic leave without the black duffel bag, this time carrying only a small maroon bag. (Aff. 8) About 15 minutes later, Picos-Ochoa left the hotel and gave $180,000 cash in a backpack to CS-2. (Aff. 8)

On May 5, 2021, surveillance observed a white Chevrolet Camaro leave the garage at the Riley Place residence at about 10:51 a.m., driving to Planet Fitness on West Dupont Road in Fort Wayne at about 11:30 a.m. (Aff. 9) At 11:44 a.m., Bostic

exited the Camaro and retrieved a bag from the trunk. (Aff. 9) Bostic then met with another confidential source (CS-3) in the Camaro, handing CS-3 a bag of cash. (Aff. 9) Agents followed CS-3 to another location and found Bostic's bag to contain $148,500. (Aff. 9) After this money drop, surveillance followed Bostic directly to the Pine Meadows residence. (Aff. 9) The location data for Bostic's personal phone confirmed these same movements, and based on his training and experience, TFO Compton believed that this money drop was related to drug trafficking. (Aff. 12)

On June 7, 2021, surveillance observed Bostic at a residence on Millbridge Court in Fort Wayne, and Bostic and several others were looking under the hood of a white Mercedes Sprinter van. (Aff. 10) After a couple of guys arrived with plastic grocery sacks, the Sprinter van left with Bostic in his Ram driving in tandem. (Aff. 10) As they drove toward Butt Road on U.S. Highway 30, officers stopped the van, and a certified drug dog alerted to the van. (Aff. 10-11) In the van, officers found a backpack that smelled like marijuana and contained $169,520 in cash. (Aff. 11) During the stop, surveillance watched Bostic driving by the van multiple times, then leaving the area and going to his Pine Meadows residence. (Aff. 11) The location data for Bostic's personal phone confirmed these same movements, and TFO Compton believed that this money was related to drug trafficking. (Aff. 12)

Agents interviewed the driver of the Sprinter van, Watson. (Aff. 11) Watson said that he was driving to Chicago for a delivery. (Aff. 11) Watson claimed to have met his boss at a Walgreen's drug store to pick up the van for the trip; however, this was not true based on surveillance. (Aff. 11-12) Watson claimed not to know what

he was delivering, and he showed agents the delivery location on his phone, which was a parking lot near O'Hare Airport. (Aff. 11) Watson's phone further showed a bunch of calls from "D Bo 1" before and during the traffic stop. (Aff. 12)

A little over a week later, on June 19, 2021, Bostic's phone travelled from the Dado Drive residence to stay overnight at a hotel near O'Hare Airport, which was where Watson was headed. (Aff. 12) On the way back to Noblesville on the following day, Bostic's phone took a rather circuitous route, avoiding U.S. Highway 30 by travelling into Michigan and Ohio before heading east into Fort Wayne and then to Noblesville. (Aff. 12-13) In TFO Compton's opinion, Bostic was trying to avoid the highway where the van was recently stopped, with this indirect route indicative of an illicit drug shipment. (Aff. 13)

After Watson's stop, Bostic's organization did not slow down their drug trafficking, which is common in TFO Compton's experience because the drug traffickers want to make money to recoup the loss. (Aff. 13) Watson's Ford Taurus was seen by surveillance in July of 2021 at Bostic's restaurant. (Aff. 13) Both physical surveillance and location data for Watson's phone showed him at the Lewis Street Grill often in September and October of 2021. (Aff. 14-15) In mid-October of 2021, Watson took a trip to Detroit, Michigan, and upon his return, surveillance saw him driving in tandem with another vehicle. (Aff. 14-15) When he returned to his residence on Moorfield Lane, surveillance watched him remove a large duffel bag and carry it inside. (Aff. 15)

In October of 2021, TFO Compton interviewed an ACPD confidential informant (CI), who had drug dealing convictions and who had provided credible information leading to arrests. (Aff. 14) CI said that police previously seized a lot of Bostic's money that belonged to "the Mexican Cartel," another way of saying drug money. (Aff. 14) The CI explained that Watson was a runner for Bostic. (Aff. 14) The CI said that Bostic was distributing large amounts of drugs through the Lewis Street Grill and that Bostic hid drugs and money in suitcases at his house and with his family members in Fort Wayne. (Aff. 14) Corroborating the CI, Bostic's bank records independently showed commingling of personal and business funds with the Lewis Street Grill, with the bank investigating this as money laundering. (Aff. 37)

On May 25, 2021, Bostic was driving a rental Jeep Compass, and after someone put an oversized duffel bag into the Jeep at the Lewis Street Grill, Bostic drove to the residence of a known drug dealer on Silver Wolf Trail in Fort Wayne, carrying a plastic sack inside. (Aff. 10) The location data for Bostic's phone confirmed this, and TFO Compton believed that this involved drug trafficking. (Aff. 12) On October 19, 2021, Bostic was in another rental vehicle, a GMC Yukon, and he drove to several residences while engaging in significant countersurveillance moves. (Aff. 15-16)

Watson took another trip to Detroit in early December of 2021, as confirmed by location data. (Aff. 17) Bostic's phone was located nearby in Detroit at this same time, and physical surveillance later saw Bostic's rental Yukon following Watson's Silverado in tandem. (Aff. 17) They headed toward Watson's residence, and Bostic's phone was turned off during this trip. (Aff. 17) After stopping, both vehicles went to

the Lewis Street Grill. (Aff. 17-18) As explained by TFO Compton, these tactics of tandem driving, turning off a phone, and utilizing a rental vehicle were all indicative of drug trafficking. (Aff. 8-9, 14, 17-18)

TFO Compton described another tandem trip on December 13, 2021, from Fort Wayne to a Walmart in Anderson, Indiana. (Aff. 18-19) The group started at a residence on Atwood Drive in Fort Wayne, where surveillance saw Bostic's rental Yukon, a white van, and Watson's Silverado. (Aff. 18-19) The three vehicles left and followed each other to an Anderson Walmart. (Aff. 18-19) Bostic's phone was off during this time, and after Watson left, Bostic turned his phone back on and proceeded to Indianapolis after eating dinner with the driver of the white van. (Aff. 18-19) The tandem driving and other concealment techniques were common features of a shipment or money drop associated with drug trafficking, and these tactics had been used by Bostic's organization on an ongoing basis for months. (Aff. 19)

On January 5, 2022, Watson took yet another trip to Detroit with Bostic's rental Yukon following in tandem. (Aff. 20-21) Physical surveillance observed Bostic driving the rental vehicle and Watson driving his Silverado, both going to Detroit and back to Fort Wayne together. (Aff. 20) In TFO Compton's opinion, they were conducting countersurveillance driving on the way to the residence on Silver Wolf Trail, which was the residence of a known drug trafficker. (Aff. 21) Upon arrival there, the woman travelling with Bostic exited and carried a bag inside, with Bostic and Watson then leaving. (Aff. 21) They soon stopped, and after Watson moved an

item from the truck bed to the back seat, they proceeded to the Lewis Street Grill, where they and some other men unloaded items from the truck. (Aff. 21)

On January 13, 2022, Bostic turned his phone off again when he was near the Pine Meadows residence. (Aff. 22) Surveillance saw him enter the residence after the garage door opened upon his arrival, with the garage door shutting when he left. (Aff. 22) Bostic then stopped in a nearby Kroger parking lot for a couple of minutes, which was indicative of a drug trafficker trying to spot someone following him. (Aff. 22) Bostic's Ram was at Pine Meadows multiple times in early February, with some of these visits short and consistent with visiting a stash house, and a white cargo van registered to Bostic was also there, with this van routinely seen at the Lewis Street Grill throughout this investigation. (Aff. 26) After a visit on February 7, 2022, Bostic went from Pine Meadows to a Kroger parking lot, drove up and down the lot, and eventually put a package in a red car, with this consistent with Bostic visiting his stash house and conducting a drug delivery elsewhere to keep secret the location of his stash house. (Aff. 26-27) On March 1, 2022, Bostic again left the Pine Meadows residence, this time in his purple Buick, which was parked in the garage. (Aff. 28)

On January 25, 2022, Bostic's Ram was parked at the Riley Place residence, and later in the day, Bostic met with Watson at a gas station on Maplecrest Road. (Aff. 23) They met briefly in Bostic's truck, and they drove in tandem to a Gordon Food Service store in Anderson. (Aff. 23) Surveillance saw Watson put a blue duffel bag from his truck into Bostic's Ram, and they exited the parking lot and split up. (Aff. 23-24) Watson came back to Fort Wayne, and Bostic met some men at an

Anderson gas station, providing the duffel bag from Watson to a man who placed it into a Buick registered to Annette Redfield in Fort Wayne. (Aff. 24)

In late January through early February of 2022, Bostic went to Las Vegas and rented a car to drive over 700 miles to Los Angeles, California, with Bostic having a suspected drug supplier in southern California. (Aff. 25-26) In early March of 2022, Bostic flew again to Las Vegas. (Aff. 29)

On February 24, 2022, surveillance again followed Bostic in his Ram from Fort Wayne to a gas station meeting in Anderson. (Aff. 27) Once there, a man exited a Buick and got into Bostic's truck with a black bag, exiting the Ram in less than a minute without the bag. (Aff. 27) The man later left the gas station and went to a residence on 11th Street in Anderson. (Aff. 27-28) This was the same residence where the Buick from the January 25 surveillance went after meeting with Bostic, with a telephone number connected to this residence registered to Leander Redfield. (Aff. 28) The man meeting with Bostic appeared to be Leander Redfield. (Aff. 28) On March 3, 2022, Bostic again met someone in this same Buick at a parking lot in Anderson, with the man from the Buick entering Bostic's Ram carrying a Styrofoam food container and then exiting with the same container. (Aff. 29)

On March 26, 2022, Watson's phone was in Detroit again, and both Watson's phone and Silverado were soon headed back to Fort Wayne. (Aff. 31) Officers stopped Watson in Allen County, and a drug dog alerted to drug odor coming from Watson's truck. (Aff. 31) Officers did not find drugs in Watson's truck, and Watson said that he went to Detroit to buy some new wheels. (Aff. 31) Officers did however observe

tool marks on Watson's taillight assemblies. (Aff. 31) On April 4, 2022, Watson flew to Los Angeles and then drove to the San Diego area. (Aff. 31)

On April 5, 2022, Bostic had his phone off for a couple of days, and his Ram pickup was at the Indianapolis airport. (Aff. 31) On this same day, Bostic rented a vehicle from Phoenix, returning it on April 7 after having driven about 325 miles. (Aff. 32) A cooperating federal defendant told agents that Bostic had drug sources of supply in southern California and was using "mules," or couriers, to drive drug loads back to Indiana, with Bostic commonly utilizing a follow car for these shipments. (Aff. 32) Bostic's Ram left the Indianapolis airport on April 11, 2022, and by this time, Bostic had turned his phone back on. (Aff. 33)

The Riley Place residence was Bostic's primary residence based on all the surveillance, both physical and through the tracking and phone warrants. (Aff. 33) Bostic was observed at this house on a weekly basis throughout the investigation. (Aff. 33) Since the Planet Fitness money drop in May of 2021, surveillance had seen Bostic's vehicles parked at this residence, and Bostic's phone was there on a regular basis, as recently as March 19, 2022. (Aff. 33-34) Records of the Allen County Assessor's Office showed the owner of this residence as Bostic's girlfriend, Andrene Nicole Sinclair, with local law enforcement reports confirming this. (Aff. 34) Bostic's phone was also in this girlfriend's name, further tying him to her and this residence. (Aff. 34) For the April 6 money drop, the unknown male retrieved a bag from a white GMC Yukon parked at the Dado Drive residence, with this truck registered to this same woman at the Riley Place address. (Aff. 5) Sinclair was also listed as the

secretary of the Lewis Street Grill, LLC, while Bostic was the registered agent, and both Bostic and Sinclair listed the Riley Place residence in the Indiana Secretary of State's business registry. (Aff. 36)

TFO Compton believed that the Pine Meadows residence was a stash house based on the information in the affidavit. (Aff. 34) Bostic's white van was normally parked there overnight, and Bostic appeared to have access to the garage door opener. (Aff. 34) The affidavit further summarized the information on Watson and his Moorfield Lane residence, including his trips to Detroit and Anderson with Bostic in tandem. (Aff. 35) In TFO Compton's opinion, Watson was a runner or courier for Bostic, meaning that Watson travelled with the drug or money shipment to shoulder most of the risk while Bostic followed. (Aff. 36)

Drug trafficking commonly generates a large amount of cash, and drug traffickers need a steady cash flow to continue to buy more drugs for distribution. (Aff. 40) Drug traffickers will often store their drug money in multiple locations to spread the risk of loss from police seizures, burglaries, and robberies. (Aff. 40-41) Drug traffickers also commonly have firearms to protect their drugs and drug money because they normally do not report losses to law enforcement. (Aff. 40-41) Drug traffickers also keep drug ledgers to track amounts owed to them, and they have extensive drug communication data regarding customers, suppliers, and other conspirators on their phones. (Aff. 41-42) Especially when a business is used to help conceal a drug enterprise, financial records are useful in investigating the money laundering associated with drug trafficking. (Aff. 42-43)

*Probable Cause*

Bostic has contended that probable cause was lacking, and in his 34-page brief, Bostic attempted to dismiss individual pieces of the affidavit without considering the totality of the circumstances. The government responds that the affidavit as a whole provided a substantial basis for Magistrate Collins's probable cause determination for both residences. Good faith otherwise justified service of these warrants.

The issuing judge's decision to authorize a search warrant is to be given "considerable weight" and "great deference," and the judge's finding of probable cause must be upheld so long as the judge could reasonably conclude that the items sought to be seized were associated with the crime and located in the place indicated. *United States v. Haynes*, 882 F.3d 662, 665 (7th Cir. 2018); *United States v. Scott*, 731 F.3d 659, 665 (7th Cir. 2013); *United States v. Aljabari*, 626 F.3d 940, 944 (7th Cir. 2010); *United States v. Wiley*, 475 F.3d 908, 915 (7th Cir. 2007); *United States v. Spry*, 190 F.3d 829, 835 (7th Cir. 1999) (recognizing that even doubtful cases should be resolved in favor of upholding the warrant). The issuing judge's finding of probable cause "carries a strong presumption of correctness." *United States v. Gibson*, 996 F.3d 451, 461 (7th Cir. 2021) (citation omitted). The duty of the reviewing court is only to ensure that the issuing judge had a substantial basis for the probable cause conclusion. *Id.* at 461; *Haynes*, 882 F.3d at 665; *United States v. Zamudio*, 909 F.3d 172, 175 (7th Cir. 2018) (citation omitted); *United States v. Kelly*, 772 F.3d 1072, 1080 (7th Cir. 2014). When the affidavit is the only evidence presented to the issuing judge, "the warrant must stand or fall solely on the contents of the affidavit." *United States*

*v. Koerth*, 312 F.3d 862, 866 (7th Cir. 2002). With a search pursuant to a warrant, the defendant bears the burden of proving its illegality. *United States v. Longmire*, 761 F.2d 411, 417 (7th Cir. 1985).

Probable cause is a nontechnical inquiry, and the search warrant affidavit will be sufficient to support a probable cause finding if, based upon the totality of the circumstances, there is a fair probability that evidence will be discovered, not whether there is an actual showing of criminal activity. *Haynes*, 882 F.3d at 665; *Scott*, 731 F.3d at 666. "Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in the magistrate's decision" on whether to issue a warrant. *Illinois v. Gates*, 462 U.S. 213, 235 (1983) (citations omitted). Probable cause requires only a probability, not certainty, and theoretical possibilities and alternate theories do not necessarily defeat a finding of probable cause. *United States v. Fifer*, 863 F.3d 759, 765 (7th Cir. 2017). With the focus on the totality of the circumstances, it is not appropriate to separate the assertions in the affidavit and then attempt to find an infirmity with each in isolation because even seemingly innocuous facts often become suspicious when considered in context or in conjunction with other facts. *Aljabari*, 626 F.3d at 944; *Wiley*, 475 F.3d at 915. Officers are entitled reasonably to rely upon their special knowledge and expertise to assess probabilities and draw inferences, and an issuing judge is entitled to rely upon the affiant's expertise in making inferences. *United States v. Sewell*, 780 F.3d 839, 845-46 (7th Cir. 2015); *Scott*, 731 F.3d at 665; *United States v. Huebner*, 356 F.3d 807, 814-15 (7th Cir. 2004). Ultimately, "affidavits

supporting search warrants must be read in a common sense fashion and not in a nitpicking, hypertechnical manner." *United States v. Gaertner*, 705 F.2d 210, 212 (7th Cir. 1983) (citation omitted).

When the probable cause information is based on an informant's tip, an issuing judge may consider the following factors in evaluating credibility: the degree of police corroboration, the informant's firsthand knowledge, the detail provided, the time between the reported events and the warrant application, and whether the informant appeared before the judge. *Haynes*, 882 F.3d at 665. Any deficiency in one or more factors may be overcome by stronger evidence in other areas. *Id.* at 665. Controlled buys add "great weight" to an informant's tip, and a properly executed controlled buy can establish probable cause, even when the tip prompting it might not be reliable. *United States v. Orr*, 969 F.3d 732, 737-38 (7th Cir. 2020) (citation omitted); *Haynes*, 882 F.3d at 666 (citations omitted). The ability of an informant to predict the future actions of a suspect is another indicator of reliability. *United States v. Cherry*, 920 F.3d 1126, 1134 (7th Cir. 2019) (citing *Gates*, 462 U.S. at 245-46).

Probable cause does not require direct evidence linking a crime to a particular place, and issuing judges are entitled to draw reasonable inferences about where evidence is likely to be kept, based upon the nature of the evidence and the type of offense. *Zamudio*, 909 F.3d at 175; *United States v. Leonard*, 884 F.3d 730, 733 (7th Cir. 2018); *Wiley*, 475 F.3d at 916. In the case of drug dealers, drug evidence is likely to be found at their residences. *Haynes*, 882 F.3d at 666; *Aljabari*, 626 F.3d at 945; *Wiley*, 475 F.3d at 916.

It is important to conduct the analysis with the appropriate deferential standard in mind. The proper question is whether Magistrate Collins had a substantial basis for her findings of probable cause, rather than launching into a *de novo* and nitpicking review of the affidavit. As the issuing judge, Magistrate Collins was responsible for making reasonable inferences about where drug evidence might be located, and rather than utilizing the correct standard, Bostic only mentioned the deferential standard in passing on page 32 of his brief. Highlighting his consideration of individual facts in isolation, Bostic erroneously stated on page 2 of his brief that the probable cause for each residence was only found on a few pages in the affidavit; however, the probable cause is based on the totality of the 44-page affidavit. Bostic's brief spent most of its effort parsing the affidavit and then attempting to explain away individual facts, rather than properly evaluating events in context based on the totality of the circumstances.

On several occasions, Bostic accused TFO Compton of failing to say that the cash originated from drug trafficking, and Bostic summarized, "Somewhere, someplace within the four corners of the Affidavit, the author has to at least allege Bostic committed a crime." (R. 46, at 5, 9, 12, 29) This criticism is not a fair reading of the affidavit. TFO Compton started his affidavit with an introduction stating that Bostic was leading a drug trafficking organization, was committing federal drug violations, and was engaged in money laundering, with the balance of the affidavit providing the details to justify these conclusions. On page 12 of the affidavit, TFO Compton specifically said that the Planet Fitness money and the money from the

Watson stop involved drug trafficking based on his training and experience. Even if TFO Compton failed to repeat his conclusions on a paragraph-by-paragraph basis, Magistrate Collins could nevertheless infer that the over $750,000 cash involved in the money drops and the Watson stop was drug money, especially considering all the information in the affidavit corroborating this reasonable inference.

Citing *United States v. $506,231 in United States Currency*, 125 F.3d 442 (7th Cir. 1997), Bostic claimed that the tremendous amounts of cash were insufficient to demonstrate illegal activity. Bostic is correct that "[t]he existence of any sum of money, *standing alone*, is not enough to establish probable cause." *Id.* at 452 (emphasis added). A large sum of money is however relevant to the probable cause determination and is incriminating when considered with other facts, such as evasive or deceptive behavior or other factors indicative of drug trafficking. *United States v. Reed*, 443 F.3d 600, 603-04 (7th Cir. 2006). The flaw in Bostic's analysis is his divide-and-conquer approach because TFO Compton did not rely on the large amounts of cash *standing alone*. The drug money conclusion was confirmed by such other things as Bostic's tandem and countersurveillance driving, the use of runners to deliver drugs and money, the suspicious trips to Detroit and Chicago, the distant trips to meet the Redfield Buick in Anderson, surveillance of Bostic's drug transactions in the Kroger parking lot near his stash house, and Watson's deception about picking up the van at Walgreens. The ACPD CI confirmed that the money from the Watson traffic stop was destined for a Mexican cartel, meaning that it was payment for drugs, and

this CI's information about Bostic using his restaurant for drug trafficking was corroborated by bank records and by the independent federal cooperating defendant.

Bostic quibbled with whether he directly provided the money to others. (R. 46, at 5-6) For example, Bostic said that the affidavit was silent about whether he carried a bag into the hotel on April 29, 2021, and he found the temporal proximity to Picos-Ochoa to be insufficient to connect him to the subsequent money drop. (R. 46, at 5-6, 8-9) As before, this analysis ignores the totality of the circumstances. Bostic was personally involved with several money transfers, including him providing an undercover officer with $136,000 in cash and providing $148,500 to an informant in a Planet Fitness parking lot. Picos-Ochoa twice delivered money for Bostic, and on both occasions, he retrieved bags from either Bostic's residence in Noblesville or a meeting with Bostic prior to the transfers. Bostic nitpicked the affidavit about whether he carried the bag into the hotel, but that was an appropriate inference for Magistrate Collins to make. Bostic's criticism is not even a fair reading of the affidavit, which on page 8 says that Bostic and Picos-Ochoa met outside the hotel, that Bostic was carrying a black duffel bag, that they entered the hotel together, and that Bostic later exited the hotel with only a small maroon bag. Magistrate Collins appropriately inferred that Bostic transferred the duffel bag to his associate inside the hotel prior to the associate's money drop because Bostic walked out without it.

Bostic tried to isolate points and provide innocuous explanations, claiming for example that a friend with car trouble might ask someone to follow him, that the money could have been for Catholic Charities, that Bostic might have been delivering

meals or picking up restaurant supplies, that Bostic turned off his phone to take a nap, and that Bostic drove by the Watson stop multiple times because he was "rubber-necking." (R. 46, at 8, 12, 15, 17, 19, 33) Even otherwise innocent behavior can arouse suspicion in light of other circumstances." *United States v. Markling*, 7 F.3d 1309, 1317 (7th Cir. 1993). Probable cause is not about certainty but about probability in light of the totality of the circumstances, and there is nothing wrong with Magistrate Collins making incriminating inferences when considering all the information together and in context. For example, Bostic engaged in the tandem driving often and on long trips, and he coupled the tandem driving with circuitous routes and countersurveillance tactics, with a corroborated CI confirming Watson the runner to carry the bag during most of the trip. Bostic was not just curious about Watson's stop, as he had just been with Watson and had been involved in four money drops of over $100,00 each. Bostic even called Watson, possibly to check up on him. Bostic drove by multiple times, and a curious and uninvolved driver would simply slow down as he drove past the stop once. He turned his phone off when driving long distances, so he could not have been taking a nap while driving. Bostic's creativity in coming up with explanations for isolated facts does not undermine the probable cause.

Bostic claimed that the money drops were not connected to the residences, and regarding the Planet Fitness transfer, Bostic alleged that he could have gotten the money from somewhere other than the Riley Place residence. (R. 46, at 5, 14, 22, 26) The latter point of course could be true, but Magistrate Collins did not have to make that inference; in other words, Bostic continued to analyze the affidavit without

explaining why the issuing judge's conclusions were unreasonable. Even if Bostic did not get the money on that occasion from Riley Place, Magistrate Collins could nevertheless infer that drug evidence was logically found where the drug dealer lives and frequents. The affidavit explained that Bostic was present at Riley Place on a weekly basis throughout the investigation, which stretched over a year, and even though Bostic thought that "regularly" staying here was nebulous (R. 46, at 26), the issuing judge could rely on common sense to interpret this term otherwise. Riley Place was his girlfriend's house, and Bostic used this address on LLC paperwork for his restaurant. Bostic conceded that the Pine Meadows house was his residence (R. 46, at 31), and the affidavit explained how Bostic's van was normally parked there overnight, how Bostic was able to open and close the garage door, how he turned off his phone when he went there, and how Bostic left and conducted drug deals in a nearby parking lot consistent with protecting this location as a potential stash house. Surveillance repeatedly observed Bostic at these residences throughout the investigation, further corroborating Bostic's access and the potential for him storing such evidence as drugs, drug money, firearms, phones, drug ledgers, and so on, which TFO Compton described as tools of the drug trade commonly found in dealers' homes.

Bostic alleged that the confidential sources were unvetted and were not subject to searches before or after the meetings.[2] (R. 46, at 7, 9-10) The problem here is that there are many other ways to demonstrate an informant's credibility, and Magistrate

[2] Although it is true that the affidavit was silent about any pre-meeting searches for the money drops on April 29 and May 5, the DEA reports documented that such searches occurred. Because this information was not included in the four corners of the affidavit, the government however is not relying on this information.

Collins appropriately found the informants credible because they were heavily corroborated by each other, the surveillance associated with the money drops, and the other information in the affidavit. To start, there were three separate informants and an undercover officer involved in the four money drops, and all four individuals mutually reinforced each other's information. Bostic personally performed two of the transfers, and Bostic performed the first with an undercover officer. For the second transfer, the affidavit documented the pre-meeting searches of CS-2 prior to Picos-Ochoa giving CS-2 the bag, and the issuing magistrate could consider CS-2's track record for being corroborated in this controlled transaction in evaluating the third money drop, which also involved CS-2. For the Planet Fitness transfer, CS-3's information was heavily corroborated by the prior transfers and by the surveillance, which observed Bostic getting a bag from the Camaro's trunk and then meeting with CS-3 in the Camaro, with DEA later meeting with CS-3 and obtaining "the bag." Ironically, Bostic ignored the vetted track record of the ACPD CI, with the CI's information previously leading to arrests and corroborated by bank records, and this CI discussed Watson as Bostic's runner and Bostic's use of the restaurant for drug trafficking. This independent CI was also heavily corroborated, and the CI further discussed the Bostic organization's involvement with drug money.

Ignoring the ongoing nature of Bostic's drug trafficking, Bostic claimed that events in isolation were stale, and he pointed out that the warrants were signed about 11½ months after the last money drop. (R. 46, at 6, 8, 11) With consumable or fungible drugs, the age of inculpatory information is certainly a factor that an issuing

magistrate should consider in determining probable cause. *United States v. Vizcarra-Millan*, 15 F.4th 473, 501-02 (7th Cir. 2021); *United States v. Pless*, 982 F.2d 1118, 1125 (7th Cir. 1992). The "[p]assage of time is less critical when the affidavit refers to facts that indicate ongoing continuous criminal activity." *Pless*, 982 F.2d at 1126. The passage of time is even less important when there is no evidence of the house being sold or the drug business ceasing operation. *United States v. Glenn*, 966 F.3d 659, 661 (7th Cir. 2020).

Although the last money drop was on May 5, 2021, there were a multitude of events showing that Bostic's organization was still going strong when the warrants were signed. Watson was stopped in June of 2021 with drug money. Watson and Bostic took tandem-driving trips to Detroit in October of 2021, December of 2021, and January of 2022. Watson made a solo trip to Detroit at the end of March of 2022, and the lack of a companion to follow him does not discount the other incriminating information. Bostic took long trips with associates to Anderson to provide suspicious bags and conduct quick meetings in December of 2021, January of 2022, February of 2022, and March of 2022. The federal cooperating defendant said that Bostic's drug supplier was in California and that Bostic used couriers to bring the drug shipments back in cars, and Bostic took trips out west in early 2022 and in April of 2022. In January and February of 2022, Bostic went to a Kroger parking lot near Pine Meadows to meet with people, with TFO Compton believing these to be drug deliveries away from a stash house so as not to compromise that location. Finally, most items sought by the warrants were not consumable drugs but were non-fungible

items such as phones, ledgers, scales, heat sealers, financial records, etc. With such significant and ongoing drug trafficking activity, there was no staleness problem.

*Good Faith*

Even if a search warrant is invalidated, the evidence is still admissible if the officers relied upon the warrant in good faith. *United States v. Orozco*, 576 F.3d 745, 750 (7th Cir. 2009); *Koerth*, 312 F.3d at 868 (citing *United States v. Leon*, 468 U.S. 897, 924 (1984)). Because the purpose of the Exclusionary Rule is deterrence, it makes no sense to penalize an officer for the magistrate's error. *United States v. Glover*, 755 F.3d 811, 818 (7th Cir. 2014). An officer's decision to seek a search warrant is *prima facie* evidence of good faith. *Koerth*, 312 F.3d at 868. It is the defendant's burden to rebut this presumption, and this burden is "heavy by design" because a judge is typically more qualified than a police officer to decide whether probable cause exists. *United States v. Matthews*, 12 F.4th 647, 653 (7th Cir. 2021). A defendant may rebut this presumption of good faith by establishing that the issuing judge wholly abandoned her judicial role or that the officer submitted an affidavit so lacking in probable cause so as to render a belief in its validity unreasonable. *Koerth*, 312 F.3d at 868. On the latter ground, the evidence is admissible pursuant to good faith unless "(1) courts have clearly held that a materially similar affidavit previously failed to establish probable cause under facts that were indistinguishable from those presented in the case at hand; or (2) the affidavit is so plainly deficient that any reasonably well-trained officer 'would have known that his affidavit failed to

establish probable cause and that he should not have applied for the warrant.'" *Id.* at 869 (citations omitted).

There is no evidence at all that Magistrate Collins improperly abandoned her judicial oversight, and Bostic has presented no case authority invalidating a similar affidavit. Bostic did not even make an argument about any lack of good faith. Even if this Court invalidated the residence warrants, the officers relied upon the warrants in good faith.

WHEREFORE, Bostic's motion to suppress should be denied.

Respectfully submitted,

CLIFFORD D. JOHNSON
UNITED STATES ATTORNEY

By: *Anthony W. Geller*
Anthony W. Geller
Assistant United States Attorney
E. Ross Adair Federal Bldg.
& U.S. Courthouse
1300 S. Harrison Street, Room 3128
Fort Wayne, IN 46802-3489
Telephone: (260) 422-2595
Facsimile: (260) 426-1616
E-mail: anthony.geller@usdoj.gov