### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Cause No. 1:22-CR-20-HAB |
| | ) | |
| DEMETRIUS BOSTIC | ) | |
| | ) | |

### OPINION AND ORDER

Demetrius Bostic, ("Bostic"), a suspected drug trafficker, is charged with drug and gun offenses in a three-count federal indictment. (ECF No. 13). These charges stemmed from evidence obtained following execution of search warrants for two locations in Fort Wayne, Indiana—one for a residence at 110 Riley Place ("Riley Place residence") and one at 6619 Pine Meadows Lane ("Pine Meadows residence"). Bostic believes that Search Warrant Affidavits ("Affidavits") lacked a substantial basis for the magistrate judge's finding of probable cause to search the residences and moves to suppress evidence from the searches. (ECF No. 46). Bostic's Motion is now fully briefed (ECF Nos. 46, 48, 52), and ripe for ruling. For the reasons below, the Court finds the magistrate's probable cause determination to be sound and DENIES Bostic's Motion to Suppress.

### SEARCH WARRANT AFFIDAVIT

FBI Task Force Officer Darren Compton[1] ("TFO Compton") drafted the Affidavits from which federal Magistrate Judge Collins found probable cause to search the Riley Place and Pine Meadows residences. (ECF Nos. 46-2, 46-4). The Affidavits for both residences are identical

---

[1] TFO Compton has 28 years' experience as a police officer, including 8 years as a drug TFO for the FBI. (ECF No. 46-2 at 7). He has worked for multiple police departments and has been a narcotics officer investigating drug-related criminal activity for over 20 years of his professional career. (*Id.*). He is intimately familiar with the investigative techniques used in drug trafficking cases. (*Id.* at 7-8).

except for the property descriptions. (*Id.*). The Court provides the following summary of the Affidavits' contents.

At the outset of the Affidavits, TFO Compton explained that the DEA and the FBI were investigating Bostic and his associates for their involvement in a large-scale drug trafficking and money laundering organization led by Bostic. (ECF No. 46-2 at 9). The investigation began in 2016 and Bostic was identified as the drug supplier for a street gang located in Fort Wayne, IN. (*Id.*). The FBI and DEA jointly investigated Bostic's activities from March 2021 until his arrest. (*Id.*).

On March 17, 2021, a DEA undercover officer ("UC") met Bostic in Indianapolis, IN, and received a black backpack containing about $136,000. (*Id.* at 10). According to the UC, Bostic had four cell phones in his possession.[2] (*Id.*). No other details are given surrounding this interaction.

On April 6, 2021, surveillance observed an unknown black male pull into one of Bostic's residences on Dado Drive in Noblesville, IN. (*Id.* at 11, 19). He was driving a Buick registered to Annettte Redfield in Fort Wayne. (*Id.* at 11). The man grabbed something from the Buick's floorboard and concealed it under his shirt as he entered the residence's garage. (*Id.*). He exited the garage shortly after empty handed. (*Id.*). A few moments later, the man retrieved a black duffel bag from a GMC Yukon parked at the residence. (*Id.*). The Yukon was registered to Andrene Nicole Sinclair, Bostic's girlfriend, at the Riley Place residence. (*Id.*). About an hour later, a Chrysler Pacifica driven by Juan Carlos Picos-Ochoa ("Picos-Ochoa") pulled up to the Dado Drive

---

[2] In February 2021, an FBI Source of Information ("SOI") provided a cell phone number for Bostic. (ECF No. 46-2 at 4). The SOI explained that this was a personal number for Bostic who also carried additional phones specifically for criminal activity. (*Id.*)

residence.[3] (*Id.*). Picos-Ochoa went into the garage empty handed but exited with a brown duffel bag that he placed in the rear hatch of the Pacifica. (*Id.*).

Picos-Ochoa then went to a residence at 30 East Georgia Street in Indianapolis. (*Id.* at 12). Minutes later, a DEA Confidential Source ("CS-1") said that Picos-Ochoa requested a meeting at "30 Georgia Street." (*Id.*). About a minute later, surveillance observed Picos-Ochoa get out of the Pacific, grab the duffel bag from the rear hatch, and walk into the alley behind the residence. (*Id.*) Surveillance believed that Picos-Ochoa entered the residence through the rear door. (*Id.*)

Another Confidential Source ("CS-2") was to meet with Picos-Ochoa for the money transfer at 30 East Georgia Street.[4] (*Id.*). Before the transfer, CS-1 notified officers that Pico-Ochoa was on his way with $125,000. (*Id.*). Surveillance then observed Picos-Ochoa walking from the back of the Georgia Street residence with a draw string bag and place the bag in the Pacifica. (*Id.*). Picos-Ochoa got into CS-2's vehicle and they drove together for a few minutes. (*Id.*). After returning to 30 East Georgia Street, Picos-Ochoa exited the vehicle, grabbed the draw string bag, and gave it to CS-2. (*Id.* at 12-13). The bag contained $124,250 in cash. (*Id.* at 13).

On April 15, 2021, surveillance observed Bostic meet with Picos-Ochoa in Indianapolis. (*Id.*). After the meeting, Bostic drove a black Dodge Ram followed by a gold Mercedes until about 2:45 p.m. that day. (*Id.* at 13-14). A few hours later, surveillance saw the Ram and the Mercedes at the Riley Place residence. (*Id.*). The Mercedes was also seen at Bostic's business, Lewis Street Grill. (*Id.* at 14).

---

[3] According to the Affidavits, Picos-Ochoa was previously identified as an associate of Bostic. (ECF No. 46-2 at 5).
[4] Before the money transfer, officers searched CS-2's person and vehicle finding no contraband or money. (ECF No. 46-2 at 12). CS-2 was also equipped with a recording device for this transfer. (*Id.*).

On April 29, 2021, surveillance watched Bostic leave the Dado Drive residence in the Ram and drive to a hotel in downtown Indianapolis. (*Id.*). "Surveillance observed Bostic meet with Picos-Ochoa outside the hotel and was carrying a black duffel bag."[5] (*Id.*). Bostic and Picos-Ochoa entered the hotel together. (*Id.*). About 2 hours later, Bostic exited the hotel carrying only a maroon bag. (*Id.*). About 15 minutes after that, Picos-Ochoa exited the hotel with a black backpack and gave $180,000 in cash to CS-2. (*Id.*).

On May 5, 2021, surveillance observed a white Chevrolet Camaro driven by Bostic leave the Riley Place residence around 10:51 a.m. and drive to a local Planet Fitness at about 11:30 a.m. (*Id.* at 15). About 15 minutes later, Bostic got out of the Camaro and retrieved a bag from its trunk. (*Id.*). A Confidential Source ("CS-3") got into the Camaro with Bostic where Bostic gave CS-3 the bag containing $148,500 in cash. (*Id.*). Bostic then drove straight to the Pine Meadows residence. (*Id.*).

On May 25, 2021, Bostic drove a rental Jeep Compass to meet with somebody at Lewis Street Grill. (*Id.* at 15-16). There, a man placed an oversized duffle bag into the rear hatch of the Compass. (*Id.*). Officers then followed Bostic as he drove the Compass to a residence on Silver Wolf Trail in Fort Wayne, IN. (*Id.* at 16). From other investigations, officers knew this residence belonged to a known drug dealer. (*Id.*). Bostic carried a plastic grocery bag into the residence. (*Id.*).

On June 7, 2021, surveillance observed Bostic at a residence on Millbridge Court in Fort Wayne, IN. (*Id.*). Bostic and two others were looking under the hood of a white Mercedes Sprinter van parked in the residence's garage. (*Id.*). Two more men arrived carrying plastic grocery bags

---

[5] Although awkward, this quotation is directly from the Affidavits and the wording is important because the parties dispute who was carrying the duffel bag—Bostic or Picos-Ochoa.

before the Sprinter van left. (*Id.*) The Sprinter van left the residence with Bostic driving in tandem in the Ram truck mentioned above. (*Id.*).

Officers pulled the Sprinter van over for speeding and, during the stop, a certified drug dog alerted to the rear of the vehicle. (*Id.*). In the van, officers found a backpack that smelled like marijuana containing $169,520.00 in cash. (*Id.* 16-17). Officers observed Bostic drive by the traffic stop "multiple times" before he drove to the Pine Meadows residence. (*Id.* at 17).

Officers interviewed the Sprinter van's driver, Jerry Watson ("Watson"). (*Id.*). Watson claimed that he was making a delivery for his boss in Chicago. (*Id.*). Although he claimed to have met his boss at a Walgreen's drug store to pick up the Sprinter van for the trip, surveillance confirms that Watson was lying. (*Id.* at 17-18). Watson stated that he did not know what was in the cab of the Sprinter van or what he was delivering but provided an address for his delivery location on his phone. (*Id.*). The location was a parking lot near O'Hare Airport in Chicago, IL. (*Id.*). During the search of Watson's phone, officers noticed multiple calls from a contact—"D Bo 1"—before and during the traffic stop. (*Id.* at 18).

On June 19, 2021, Bostic's phone[6] travelled from the Dado Drive residence to stay at a hotel near O'Hare Airport in the same area where Watson claimed he was making the delivery. (*Id.*). The phone then travelled from Chicago into Michigan and Ohio before heading east into Fort Wayne and then to Noblesville, IN. (*Id.* at 18-19). TFO Compton believed that Bostic was trying to avoid the highway where the Sprinter van was stopped and that the circuitous route suggested an illegal drug shipment. (*Id.*).

---

[6] Officers had previously obtained a warrant to track one of Bostic's phones.

On October 12, 2021, officers interviewed an Allen County Police Department Confidential Informant ("ACPD CI"). (*Id.* at 20). The Affidavits note that the ACPD CI had prior convictions for drug dealing and had previously provided credible information to law enforcement which led to arrests. (*Id.*). The ACPD CI told officers that the police seized a large amount of money from Bostic that belonged to the "Mexican Cartel." (*Id.*). They also informed officers that Watson was a runner for Bostic. (*Id.*). And the ACPD CI explained that Bostic was moving large amounts of narcotics through the Lewis Street Grill, with Bostic hiding drugs and money in suitcases at his house and with family members in Fort Wayne. (*Id.*). Bank records confirm that Bostic was commingling personal and business funds through Lewis Street Grill. (*Id.* at 43).

Based on location data from Watson's phone, he took a trip to Detroit on December 3, 2021. (*Id.* at 23). Bostic's phone was also in Detroit near Watson's phone on that day. (*Id.*). Physical surveillance later observed Watson's Chevrolet Silverado driving in tandem with a GMC Yukon that Bostic rented. (*Id.*). They both drove to a location near Watson's residence and stopped briefly before going to Lewis Street Grill together. (*Id.*).

On December 13, 2021, there was another tandem trip from Fort Wayne to a Walmart in Anderson, IN. (*Id.* at 24). Surveillance observed Bostic's rental Yukon, Watson's Silverado, and a white van all parked at a residence on Atwood Drive in Fort Wayne. (*Id.*). All three vehicles left the residence at the same time (*Id.*). A little over an hour later, all three vehicles parked together at the Walmart in Anderson. (*Id.*) Bostic's phone was turned off during the voyage. (*Id.*). Officers observed Watson's Silverado leave the parking lot with Bostic and the van's driver going into the Walmart. (*Id.*). Bostic then turned his phone back on. (*Id.*).

On January 5, 2022, Watson's Silverado was traveling out of Fort Wayne towards Detroit. (*Id.* at 26). Officers picked up surveillance on the Silverado as it returned to Fort Wayne and

observed that Watson was driving it with Bostic following him in the rental Yukon. (*Id.*). Watson and Bostic, in tandem, took an obtuse route to the residence on Silver Wolf Trail where a known drug dealer resided. (*Id.* at 27). When they arrived at the residence, an unknown female passenger exited Bostic's rental and carried a bag into the residence. (*Id.*). Bostic and Watson then drove to Lewis Street Grill where they met other individuals who unloaded items from both vehicles. (*Id.*).

On January 13, 2022, Bostic's phone was turned off while in an area near the Pine Meadows residence. (*Id.* at 28). Later that day, surveillance observed Bostic pull up to the Pine Meadows residence in the rental Yukon, with the garage door opening upon his arrival. (*Id.*). Bostic's phone was turned off while at the residence. (*Id.*). Bostic went into the residence for a few moments, returned to the Yukon, and left with the garage door closing as he pulled away. (*Id.*). He then went to a Kroger parking lot for a few minutes, did not exit the vehicle, and left the parking lot. (*Id.*). TFO Compton believed this to be a countersurveillance maneuver to see if anybody followed him from the Pine Meadows residence. (*Id.*).

On January 25, 2022, surveillance observed the black Ram truck parked in the driveway of the Riley Place residence. (*Id.* at 29). Later in the day, Bostic drove the Ram to meet with Watson at a Marathon Gas Station. (*Id.*) Watson got into the Ram with Bostic briefly before returning to his vehicle. (*Id.*). Bostic and Watson then left the gas station and drove to a Gordon Food Service store in Anderson, IN. (*Id.*). Surveillance watched Watson grab a blue duffle bag from his Silverado and place it in the bed of the Ram. (*Id.*). Both Watson and Bostic left the parking lot in their respective vehicles and split up. (*Id.* at 29-30). Watson returned to Fort Wayne while Bostic met a few individuals at a gas station in Anderson. (*Id.* at 30). One of the individuals took the

duffel bag from the Ram and placed it into a Buick registered to Annette Redfield in Fort Wayne.[7] (*Id.*). The Buick then drove to a residence on 11th Street in Anderson ("11th Street residence"). (*Id.* at 34).

Surveillance saw the Ram present at the Pine Meadows residence multiple times in early February 2022. (*Id.* at 32). A white cargo van registered to Bostic was also observed at the residence on February 4, 2022. (*Id.*) On February 7, 2022, Bostic drove to the Pine Meadows residence, stayed for a short period, and then drove to a Kroger parking lot. (*Id.*). In the parking lot, Bostic drove up and down each row of cars as if he were looking for someone. (*Id.*). While there, Bostic placed a package in a red car. (*Id.* at 33). On March 1, 2022, officers saw Bostic leave the Pine Meadows residence in his vehicle that had been parked in the garage. (*Id.* at 34).

On February 24, 2022, surveillance again followed Bostic driving the Ram from Fort Wayne to a gas station in Anderson. (*Id.* at 33). Once at the gas station, a man exited a Buick and got into Bostic's truck carrying a black bag. (*Id.*). After about a minute, the man exited the Buick without the black bag. (*Id.* at 34). Officers followed the Buick after it left the gas station and drove to the 11th Street residence. (*Id.*). A telephone number registered to Leander Redfield was connected to the residence, and it appeared that the man at this meeting was Leander Redfield. (*Id.*). On March 3, 2022, Bostic again met somebody in the same Buick at a parking lot in Anderson. (*Id.*).

On April 4, 2022, Watson flew to Los Angeles and then drove down to the San Diego area. (*Id.* at 37). A day later, Bostic's Ram was at the Indianapolis Airport, with Bostic's phone turned

---

[7] According to the Affidavits, a vehicle registered to Annette Redfield also participated in the money drop on March 17, 2021. (ECF No. 46-2).

off for several days before the Ram made it to the airport.[8] (*Id.*). On the same day, Bostic rented a car in Phoenix and returned it two days later after driving about 325 miles. (*Id.* at 38). A cooperating federal defendant informed the FBI that Bostic had drug sources in southern California and used "mules" to drive his drugs from California to Indiana, commonly using tandem driving techniques through a follow car. (*Id.*). It is worth noting that in early 2022, Bostic went to Las Vegas, rented a car, and drove over 700 miles to Los Angeles. (*Id.* at 31-32). He made another trip to Las Vegas in March 2022. (*Id.* at 35).

In TFO Compton's opinion, Bostic engaged in common concealment tactics associated with drug trafficking. Bostic used four phones and drug traffickers often compartmentalize their phones to separate criminal and personal uses. (*Id.* at 10). Many times, Bostic and his associates used tandem driving techniques which drug traffickers commonly use for the security of their drug shipments. (*Id.* at 14). For example, if police were nearby, the follow vehicle would create a distraction to divert attention from the car carrying the drug shipment. (*Id.* at 14, 26). Bostic commonly used the black Ram truck registered to Jackie Shouse in Muncie, IN. (*Id.* at 44-46). Drug traffickers often use vehicles in another's name to shield their identities and protect assets from forfeiture. (*Id.*). And even though Bostic owned personal vehicles, he often used rental cars. (*Id.* at 15). He also drove circuitous and indirect routes which is a countersurveillance measure employed by drug traffickers. (*Id.* at 19, 23). Bostic turned off his phone when engaging in suspicious activity which is a common technique for a drug dealer who is attempting to conceal his location. (*Id.* at 20, 23).

---

[8] When the Ram truck left the airport on April 11, 2022, Bostic's phone was turned back on. (ECF No 46-2 at 39).

From the investigation, TFO Compton determined that the Riley Place residence was Bostic's primary residence. (*Id.* at 39). Bostic was observed at the residence on an almost weekly basis. (*Id.*). Bostic's vehicles were seen at the residence since May 2021 and his phone was present at the residence regularly. (*Id.* at 39-40). Bostic was at the Riley Place residence as recently as March 19, 2022. (*Id.*). Bostic's girlfriend, Andrene Sinclair, is the record owner of the Riley Place residence. (*Id.* at 40). And further connecting Bostic to the Riley Place residence, Bostic's phone was in Sinclair's name. (*Id.*). Sinclair is the secretary of Lewis Street Grill and Bostic is the registered agent and owner. (*Id.*). Both Bostic and Sinclair listed the Riley Place residence with the Indiana Secretary of State's business registry. (*Id.* at 42).

TFO Compton also believed that the Pine Meadows residence was a stash house based on the investigation. (*Id.* at 40). Bostic's white van was seen at the Pine Meadows residence frequently and it appeared that he had unrestricted access to the residence. (*Id.*). In TFO Compton's training and experience, drug traffickers will commonly store their drug money in multiple locations to spread the risk of loss from police seizures or theft. (*Id.* at 46).

## DISCUSSION

"The Fourth Amendment's strong preference for the use of search warrants calls for probable cause determinations by a 'neutral and detached magistrate' as opposed to 'officer[s] engaged in the often competitive enterprise of ferreting out crime.'" *United States v. Clark*, 935 F.3d 558, 563 (7th Cir. 2019) (quoting *Johnson v. United States*, 333 U.S. 10, 14 (1948)). "The application for a warrant 'must provide the magistrate with a substantial basis for determining the existence of probable cause.'" *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 239 (1983)). "The ability of the neutral and detached magistrate to determine probable cause depends on the accuracy of the information the police submit." *Id.* The issuing judge's finding of probable cause "carries a

strong presumption of correctness." *United States v. Gibson*, 996 F.3d 451, 461 (7th Cir. 2021) (citation omitted)

Probable cause presents a practical, nontechnical, and commonsense inquiry that asks whether there is a fair probability, under the totality of the circumstances, that evidence of a crime will be found in a particular place. *Gates,* 462 U.S. at 238. When, as here, an affidavit is the only evidence presented to a judge to support a search warrant, the warrant's validity rises and falls on the strength of the affidavit. *United States v. Orozco*, 576 F.3d745, 748 (7th Cir. 2009).

Bostic contends that there was no substantial basis from TFO Compton's Affidavits for the magistrate to conclude probable cause existed to search the Riley Place and Pine Meadows residence. His arguments come in several flavors. He first targets the officers' investigation because the money drops did not involve any direct evidence of drugs, and just the presence of a large amount of money is insufficient for a finding of probable cause for a crime. Second, he contends that most of the money drops were not connected to the Riley Place or Pine Meadows residences. Third, he calls the information in the Affidavits stale because the most recent completed money drop occurred about a year before the warrants were executed. Fourth, Bostic questions the reliability and credibility of all the informants and confidential sources throughout the investigation. And he comes with a plethora of alternative explanations for conduct TFO Compton couches as indicative of criminal activity.

Bostic has done an admirable job thumbing through the Affidavits and pointing out where perhaps TFO Compton could have been more thorough or thought more carefully. But it is understood that search warrant affidavits "are normally drafted by nonlawyers in the midst and haste of a criminal investigation" *United States v. Ventresca,* 380 U.S. 102, 108 (1965), and so "[a]n affiant cannot be expected to include in an affidavit every piece of information gathered in

the course of an investigation." *United States v. Colkley,* 899 F.2d 297, 300 (4th Cir. 1990). Totality of the circumstances means all the circumstances. And Bostic appears to do precisely what courts in this Circuit and across the country caution against: "When we evaluate a probable cause finding, we do not view the individual facts in isolation." *United States v. Carswell*, 996 F.3d 785, 793 (7th Cir. 2021). Even with a few holes, there was a substantial basis for the magistrate's probable cause determination, and in any event, officers executed the warrants in good faith.

From just the money drops and Watson's stop, Bostic's organization handled over $750,000 in cash from March to June 2021. Citing *United States v. $506,231 in U.S. Currency,* 125 F.3d 442 (7th Cir. 1997), Bostic claims that just the presence of cash is insufficient to demonstrate illegal activity. True, "[t]he existence of any sum of money, *standing alone*, is not enough to establish probable cause." *Id.* at 452 (emphasis added). But therein lies the flaw in his argument; the Affidavits provide much more information than simply the exchange of large cash sums. And "the existence of a large amount of cash and its concealment…is a relevant circumstance" in the probable cause analysis—especially when paired with other behaviors indicative of drug trafficking. *United States v. Reed*, 443 F.3d 600, 603-04 (7th Cir. 2006).

That said, TFO Compton's conclusion that the money was drug profits was supported by a good deal of other suspicious activity. When conducting these drops, Bostic and his associates used tandem driving and countersurveillance techniques which TFO Compton explained was common practice for drug traffickers. *See United States v. Elst*, 579 F.3d 740, 746 (7th Cir. 2009) ("Experienced law enforcement officers (as well as experienced magistrates) are permitted to draw reasonable inferences from the facts based on their training and experience."). For example, before the June 7, 2021, traffic stop where officers seized about $170,000, Watson was seen driving in tandem with Bostic. Watson lied about where he was coming from that evening

12

and officers observed Bostic drive by the traffic stop "multiple times" before he drove to the Pine Meadows residence. Officers noticed multiple calls from a contact—"D Bo 1"— to Watson before and during the traffic stop. One could reasonably infer that "D-Bo" is short for Demetrius Bostic. The ACPD CI explained that the money from the stop was destined for a Mexican cartel, indicating that it was payment for drugs.

Bostic was personally involved with several money transfers, including him providing an undercover officer with $136,000 in cash and providing $148,500 to an informant in a Planet Fitness parking lot. The ACPD CI also confirmed Bostic's use of runners. Picos-Ochoa twice delivered money for Bostic—around $125,000 on April 15, 2021, at the Georgia Street residence and $180,000 on April 29, 2021, at a hotel. Both times, Picos-Ochoa retrieved bags from either Bostic's residence in Noblesville or a meeting with Bostic before the transfers. As for the hotel transfer, Bostic challenges the determination that he provided the money to Picos-Ochoa based on the Affidavits' statement that "Surveillance observed Bostic meet with Picos-Ochoa outside the hotel and was carrying a black duffel bag." (ECF No. 46-2 at 14). Admittedly, that statement is ambiguous as to who carried the duffel bag into the hotel. But a fair inference is that Bostic carried it in and left empty handed. *See United States v. Carmel*, 548 F.3d 571, 575 (7th Cir. 2008) ("Judges may draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a warrant."). And either way, Bostic entered the hotel with Picos-Ochoa before the transfer.

Bostic next posits that the money drops were not connected to the Riley Place or Pine Meadows residences. "Probable cause exists when the supporting affidavit presents a total set of circumstances which create a 'fair probability' that a search will uncover evidence of a crime." *United States v. Haynes*, 882 F.3d 662, 665 (7th Cir. 2018). "[P]robable cause does not require

direct evidence linking a crime to a particular place" and issuing judges "may draw reasonable inferences about where evidence is likely to be found based on the nature of the evidence and the offense." *United States v. Zamudio*, 909 F.3d 172, 175 (7th Cir. 2018). And the Seventh Circuit has recognized that "evidence is likely to be found where the drug dealers live." *Id.* at 176.

As for the Riley Place residence, TFO Compton determined that it was Bostic's primary residence. Although Bostic now claims that the Pine Meadows residence was his actual home, that does not make his conclusion unreasonable.[9] *See Elst*, 579 F.3d at 746. Bostic was observed at the Riley Place residence weekly throughout the investigation. Bostic's girlfriend was the record owner of the property with Bostic's phone is in his girlfriend's name. Before the May 5, 2021, money drop, Bostic departed from the Riley Place residence before providing CS-3 with about $150,000. As Bostic points out, 53 minutes elapsed from his trip from the residence to the drop location; whereas a direct route of travel would have taken about 10 minutes. And the Affidavits do not state that Bostic took circuitous routes during his travel as with the other money drops. A fair inference is that Bostic stopped somewhere along the way. Another fair inference is that he took a circuitous route to the drop location. In any event, Bostic's person, vehicles, and phones were present at Riley Place throughout the investigation spanning over a year. And that Bostic may have stopped along the way does not thwart the fact that Bostic used this address on his business's paperwork, a business that the ACPD CI said that Bostic was using to conduct drug trafficking. At minimum, Bostic had strong connections to this residence through his girlfriend and business, stopped there before a money drop, and was there often. All told, Magistrate Judge

---

[9] Moreover, this admission leads the Court to question whether Bostic even has standing to challenge the search of the Riley Place residence. *See United States v. Mendoza,* 438 F.3d 792, 795 (7th Cir. 2006) (holding that a defendant must have a reasonable expectation of privacy in order to challenge the search of a residence); *United States v. Kelly*, 772 F.3d 1072, 1083-84 (7th Cir. 2014) ("A 'search' within the meaning of the Fourth Amendment occurs only where an individual has a reasonable expectation of privacy in the area searched. If such an expectation is lacking, the individual has no standing to challenge the search.").

Collin's reasonably inferred that evidence of drug trafficking would be located at the Riley Place residence.

Turning to the Pine Meadows residence, Bostic concedes in his brief that this was his primary residence albeit that information was not known to officers at the time the Affidavits were drafted. Even so, Bostic was a frequent flyer at this residence too. After the May 5, 2021, money drop, Bostic drove straight to the Pine Meadows residence. On June 7, 2021, officers pulled Watson over and seized about $170,000 from the van he was driving. Bostic was driving in tandem with Watson when he was pulled over and after Bostic drove by the stop multiple times, he again went straight to the Pine Meadows residence. And on February 7, 2022, Bostic departed from the Pine Meadows residence, went to a nearby Kroger parking lot, drove up and down the lot's rows multiple times, and then placed a package in a red car—consistent with a drug deal and Bostic's desire to shield the residence from suspicion. Bostic's vehicles were seen at the residence all throughout the investigation. It appears he had uninhibited access to it through a garage door opener. Bostic also turned off his phone while present there indicating a further desire to protect the location from unwanted attention. There is plenty of evidence here to support that evidence of drug trafficking would be discovered at the Pine Meadows residence too.

Bostic also challenges the sufficiency of the Affidavits because the last money drop occurred about a year before the warrants were signed. While true that "[t]he age of the information supporting" a search warrant "is a factor the magistrate should consider[,] [i]t is, however, only one factor." *United States v. Batchelder*, 824 F.2d 563, 564–65 (7th Cir. 1987). "If other factors indicate that the information is reliable and that the object of the search will still be on the premises, then the magistrate should not hesitate to issue a warrant." *Id.* "The passage of time is less critical when the affidavit refers to facts that indicate ongoing continuous criminal activity." *United States*

*v. Pless*, 982 F.2d 1118, 1126 (7th Cir. 1992). And it becomes even less important when there is no evidence that the residence was sold or that the drug business ceased operations. *See United States v. Glenn*, 966 F.3d 659, 661 (7th Cir. 2020) ("If the house had been sold in the interim, or if there were some reason to think that Glenn had changed his line of business, then the passage of time would provide reason to doubt the inference that a place used to distribute drugs in the recent past is still used for that purpose.").

Even though the last money drop occurred in May 2021, Watson was stopped in June 2021 where officers seized about $170,000. The passage of about 10 months' time is not fatal to the magistrate's probable cause determination especially where—as here—the evidence shows that Bostic's organization continued operations after the June 2021 seizure. *See Batchelder*, 824 F.2d 564 (finding that search warrants were not stale when based on information that was 9 months' old). And after Watson's stop, Bostic and Watson took tandem driving trips to Detroit in October 2021, December 2021, and January 2022. A federal cooperating defendant told officers that Bostic's drug supplier lived in California and that he used couriers to drive the drug shipments to Indiana. Bostic took trips out west in January 2022 and April 2022. In January 2022 and February 2022, Bostic traveled to the Kroger parking lot near the Pine Meadows residence. TFO Compton believed that these were drug deliveries or maneuvers to avoid compromising the suspected stash house's location. And as for the residences themselves, the Affidavits reveal that Bostic was last present at the Pine Meadows residence on March 1, 2022, and the Riley Place residence on March 19, 2022. The warrants were signed on April 15, 2022—about a month later. Moreover, there is no evidence that the properties were ever transferred to another and many items sought by the

warrant were not fungible goods.[10] Based on the ongoing activity throughout the yearlong investigation, there is no staleness problem here.

Bostic next challenges the Magistrate's probable cause determination based on the credibility of various confidential informants. Anonymous tipsters and confidential informants require additional indicia of reliability to support probable cause. *See United States v. Johnson*, 289 F.3d 1034, 1038 (7th Cir. 2002). The factors that inform this analysis are: "(1) the degree to which police corroborated the informant's statements; (2) the degree to which the informant's knowledge of the events was acquired through firsthand observation; (3) the amount of detail included in the informant's statement; (4) the amount of time between the date of the events and the police officer's application for the search warrant; and (5) whether the informant appeared before the magistrate who issued the warrant." *United States v. Hollingsworth*, 495 F.3d 795, 804 (7th Cir. 2007). "The ability of an informant to predict future actions of others with specificity is" another indicator of reliability. *United States v. Cherry*, 920 F.3d 1126, 1134 (7th Cir. 2019) (citing *Gates*, 462 U.S. at 245-46). Weaknesses of one factor can be compensated by the strength of another. *United States v. Brack*, 188 F.3d 748, 756 (7th Cir. 1999).

First, this standard is only dispositive, "when the evidence supporting an application for a search warrant consists **only** of a tip from an informant." *Hollingsworth,* 495 F.3d at 804 (citing *United States v. Koerth*, 312 F.3d 862 (7th Cir. 2002)) (emphasis added). There are many facts from the contemporaneous investigation that support probable cause. Even still, the confidential informants did provide significant information. Their reliability thus warrants the Court's attention.

---

[10] For example, the warrants permits a search for items such as phones, ledgers, scales, heat sealers, financial records, and so on. (ECF No. 46-1).

There were five separate confidential informants here: the DEA UC, CS-1, CS-2, CS-3, and the ACPD CI. There is no issue with the DEA UC's credibility, and he was the informant that obtained $136,000 from Bostic during the March 17, 2021, money drop. As for CS-1, CS-2, and CS-3, the Affidavits do not describe who they were or whether they were receiving a benefit for their assistance. But all three were able to successfully obtain over $100,000 from Bostic's organization via money drops. On April 6, 2021, CS-2 obtained about $125,000 from Picos-Ochoa, a known associate of Bostic. Officers searched CS-2's vehicle before and after this drop and equipped CS-2 with an audio/video recording device. And before the deal, CS-1 coordinated with officers and predicted Picos-Ochoa's movements to the drop location and the dollar amount. *See Cherry*, 920 F.3d at 1134.

CS-2 conducted another money drop on April 29, 2021, from Picos-Ochoa. This time, Bostic and Picos-Ochoa walked into the drop location together, and CS-2 walked out with about $180,000. On May 5, 2021, CS-3 obtained $148,500 directly from Bostic. CS-3 later handed the money over to officers in the same bag Bostic was seen with before the deal. Although the Affidavits do not state whether searches occurred before the last two drops[11], officers followed CS-2 and CS-3 after these deals with the confidential sources handing over the anticipated amounts. "Controlled buys add great weight to an informant's tip[,]" *United States v. McKinney*, 143 F.3d 325, 329 (7th Cir. 1998), and "[a] properly executed controlled buy can establish probable cause, even when the tip that prompted it might not have been reliable." *Haynes*, 882 F.3d at 666. The Court sees little difference between a controlled buy and the money drops here. The successfully conducted money drops weighs favorably towards a finding of reliability. Even if the

---

[11] While the Affidavits were silent about any pre-drop searches, the Government states that the DEA reports documented that such searches did occur. (ECF No. 48 at 21). Yet the Court cannot consider this information as it was not included in the four corners of the Affidavits.

Court found otherwise, there was still a plethora of other facts which establishes probable cause here.

As for the ACPD CI, Bostic contends that there was zero indicia of the informant's reliability in the Affidavits. This is simply not true. The Affidavit notes that the ACPD CI was "an informant with prior conviction from drug dealing that has provided credible information to Law Enforcement in the past which has led to arrests[.]" (ECF No. 46-2 at 20). After Watson's stop in which officers seized about $170,000, the ACPD CI stated that law enforcement had seized a large amount of cash from Bostic that belonged to the Mexican Cartel. They told officers that Watson was a runner for Bostic which is corroborated by the surrounding investigation and the stop itself. And the ACPD CI told officers that Bostic was moving large amounts of narcotics through his business which was corroborated by bank records. The Court sees little reason to doubt the magistrate's determination that the ACPD CI was credible and reliable.

Lastly, Bostic comes forward with a plethora of alternative explanations for behaviors that TFO Compton calls indicative of drug trafficking. For example, he explains that tandem driving occurs when a friend has car trouble or people go to the store in separate vehicles; that the money seized could have been for Catholic Charities; that his travels to Detroit, Anderson, and Indianapolis could have been to obtain supplies for his business; that he turned off his phone for privacy or to take a nap; that he drove by Watson's stop several times as a curious bystander; and that "D-Bo" who called Watson before and after the stop could have been anybody in light of the hit film, "Friday."[12] (ECF Nos. 46, 52). But the flaw in Bostic's argument is that he views these events and behaviors in isolation, ignoring all other aspects of the investigation. "Even otherwise innocent behavior can arouse suspicion in light of other circumstances." *United States v. Markling*,

---

[12] https://en.wikipedia.org/wiki/Friday_(1995_film)

7 F.3d 1309, 1317 (7th Cir. 1993). Such is the case here, supported by TFO Compton's expert opinion. Based on the totality of the circumstances, Magistrate Judge Collins reasonably concluded that these were not mere innocent acts. *See United States v. Gibson*, 996 F.3d 451, 461 (7th Cir. 2021) (The issuing judge's finding of probable cause "carries a strong presumption of correctness.").

Simply put, the search warrant affidavit "set[] forth sufficient evidence to induce a reasonably prudent person to believe that a search" of the Riley Place and Pine Meadows residences "[would] uncover evidence of a crime." *See United States v. Mykytiuk*, 402 F.3d 773, 776 (7th Cir. 2005). Context matters. And with everything placed in context, Bostic frequented the Riley Place and Pine Meadows residences throughout a yearlong investigation riddled with evidence of criminal activity.

Even if probable cause were lacking (it is not), "[t]he fruits of an invalid search warrant may be admitted at trial if the officer relied on the invalid warrant in good faith." *United States v. Orozco*, 576 F.3d 745, 750 (7th Cir. 2009) (citing *United States v. Leon*, 468 U.S. 897, 922 (1984). "An officer's decision to obtain a warrant is *prima facie* evidence that she was acting in good faith." *Id.* (citing *Mykytiuk*, 402 F.3d at 777). "The burden to show unreasonable reliance on a warrant is heavy by design." *United States v. Matthews*, 12 F.4th 647, 653 (7th Cir. 2021). A defendant "can rebut the presumption of good faith by showing that (1) the issuing judge abandoned his role as a neutral and detached arbiter; (2) the officers were reckless or dishonest in preparing the supporting affidavit; or (3) the affidavit was so lacking in probable cause that no officer could have reasonably relied on it." *Id.* The Government contends that the evidence would still be admissible under the Good Faith exception. Bostic confines his argument to the last point;

he claims that no reasonable officer could have believed the Affidavits were sufficient to establish probable cause.

Bostic's argument does not provide much for this Court to chew on. He merely lists TFO Compton's experience and states that TFO Compton "would have known [the Affidavits] failed to establish probable cause." (ECF No. 52). Having already found that the Affidavits supplied sufficient probable cause to search the Riley Place and Pine Meadows residences, the Court need not belabor the point. Bostic has presented no case authority invalidating a similar affidavit, relying on his arguments against probable cause. *See United States v*. Koerth, 312 F.3d 862, 869 (7th Cir. 2002) ("[W]e will admit the evidence unless: (1) courts have clearly held that a materially similar affidavit previously failed to establish probable cause under facts that were indistinguishable from those presented in the case at hand; or (2) the affidavit is so plainly deficient that any reasonably well-trained officer would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant."). And for the reasons outlined above, the Affidavits were not so "plainly deficient" that no reasonable officer would have applied for a warrant. *Id.* His general assertion that TFO Compton would have known that the Affidavits failed to establish probable cause does little, if anything, to rebut the presumption that officers executed the search warrants in good faith. This is all the more true considering the Court has found that probable cause existed from the face of the Affidavits.

In conclusion, there was probable cause to search the Riley Place and Pine Meadows residences and, in any event, officers executed the warrant in good faith.

## **CONCLUSION**

For these reasons, Defendant's Motion to Suppress (ECF No. 46) is DENIED. A scheduling order will issue by separate entry.

SO ORDERED on December 7, 2024.

s/ *Holly A. Brady*
CHIEF JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT