**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CASE NUMBER: 1:22-CR-20** |
| | ) | |
| **DEMETRIUS R. BOSTIC** | ) | **JUDGE: HOLLY A. BRADY** |
| | ) | |
| **Defendant.** | ) | |

**Defendant's Motion For *Franks* Hearing.**

Comes Now, the Defendant. Demetrius Bostic, by counsel and motions the Court to grant a hearing in this case pursuant to: the Fourth Amendment; *Franks v. Delaware,* 438 U.S. 154 (1978); and the Federal Rules of Criminal Procedure 12(b)(3)(C) and 41(h). Bostic asks for an evidentiary hearing; and for an order suppressing all evidence obtained through the search warrant obtained on April 15, 2022, for 6619 Pine Meadows Lane, Fort Wayne, Indiana and 110 Riley Place. Bostic also files, simultaneously with this Motion a Motion to Suppress. It is incumbent upon Bostic to show the Court that the Affidavits in this case, which were granted in order to authorize the searches of 6619 Pine Meadows Lane, Fort Wayne Indiana and 110 Riley Place[1], Fort Wayne, Indiana, contained deliberate false assertions of fact or were otherwise written with reckless disregard for the truth.

> In the present case the Supreme Court of Delaware held, as a matter of first impression for it, that a defendant under *no* circumstances may so challenge the veracity of a sworn statement used by police to procure a search warrant. We reverse, and we hold that, where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was ***156** included

[1] Only the search warrant affidavit for 6619 Riley Place is submitted with this Brief. The two search warrants are identical in content except for the addresses on the signature page. Footnotes referencing Exhibits A and B are made to the specific paragraph in each exhibit. Footnotes referencing Exhibit C are made to the page number of that exhibit **not** the Bates number.

> by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.
>
> *Franks v. Delaware*, 438 U.S. 154, 155–56, 98 S. Ct. 2674, 2676, 57 L. Ed. 2d 667 (1978)

The *Franks* Court went on to hold that:

> There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant. To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof.
>
> *Id.* 438 U.S. 154, 171–72, 98 S. Ct. 2674, 2684–85, 57 L. Ed. 2d 667 (1978)

The Seventh Circuit Court has relied on the Supreme Court's *Franks* Decision on numerus occasions. Including:

> If police officers obtain a search warrant by deliberately or recklessly providing the issuing court with false, material information, the search warrant is invalid. In *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the Supreme Court held that when a defendant makes a substantial preliminary showing that the police procured a warrant to search his property with deliberate or reckless misrepresentations in the warrant affidavit, and where such statements were necessary to the finding of probable cause, the Fourth Amendment entitles the defendant to an evidentiary hearing to show the warrant was invalid.
>
> *United States v. McMurtrey, 704 F.3d 502, 504 (7th Cir. 2013)*

**<u>Analysis of the Search Warrants in Question</u>**

Officer Compton begins the Probable Cause section of the Affidavit with the comment that Bostic was the drug supplier for the "Mafia" street gang in Fort Wayne, Indiana. By the way the paragraph is structured this "drug supplying" dates back to 2016. (Search Warrant Affidavit Exhibit C p. 4). There isn't a single fact to back up the veracity of this claim. Even if such a fact

existed, (which it doesn't), the accusation is based on stale dated evidence. Bostic brings this to the Court's attention because this kind of baseless accusation sets the tone for the entire affidavit.

The Jackson County Search Warrant Affidavit, Dated March 25, 2021, Exhibit A, describes the events of March 15, 2021 through March 17, 2021 with the following language:

> 8. On or about March 15, 2021, a DEA confidential source (CS), acting as a money launderer negotiated with an unknown male to arrange a money pickup of suspected drug proceeds in the Indianapolis area. The CS and unknown male both agreed to have "their people" meet in Indianapolis on March 17, 2021. Through my training and experience, I know drug trafficking and money laundering organizations often look for individuals to assist in moving large amounts of U.S. currency to continue their criminal enterprise.
>
> 9. On March 17, 2021, a DEA Undercover Officer met with Bostic in Indianapolis, Indiana in a mall parking lot and received a back backpack containing $135,920 in U.S. currency. During the meet the Undercover Officer observed four cell phones in possession of Bostic.
>
> 10. The DEA Undercover Officer and BOSTIC did not know each other, had never met each other previously, and had never spoke with each other by telephone or online previously.

This affidavit leaves wide open the question of how the DEA Undercover Officer knew the person he met with on March 17, 2021, was in fact Bostic or how the person described as "Bostic" knew the contents of the bag, if the person described as "Bostic" was simply assisting someone else in the movement of the money.

Agent Compton, however, in the Search Warrant Affidavit, avoids the perils of these descriptions with his single, laconic paragraph:

> On March 17, 2021, a DEA Undercover Officer met with Demetrius Bostic in Indianapolis, Indiana and received a black backpack containing approximately $136,000 in U.S. Currency. During the meet the Undercover Officer observed Bostic to be in possession of 4 different cell phones.
>
> (Ex. C, p. 4).

Not a word was written about the lack of familiarity between the parties. Nor was there any description of how the DEA Undercover Officer could have known he was actually meeting with Bostic. There must be some explanation of why this important information was not disclosed in TFO Compton's Affidavit. The only logical explanation is that TFO Compton intentionally excluded the information included by TFO Carver because he knew that the inclusion of that language would result in a denial of the search warrant by any federal judge.

TFO Matthew Carver, the author of the Jackson County Affidavits described events that occurred during March and April of 2021 as follows:

> 11. From March 31, 2021 to April 2, 2021 surveillance observed Bostic travelling around the central Indiana area with two co-conspirators that were identified as Juan Picos-Ochoa and Francisco Rodriguez-Gonzalez. During this time period, investigators observed Bostic pick up drug proceeds on at least one occasion. (Search Warrant Affidavit of May 10, 2021, Exhibit B).

This is a conclusory statement unless Picos-Ocha or Rodriguez-Gonzalez is acting as an informant. If either is acting as an informant in exchange for leniency or any other benefit their status should have been disclosed because such treatment would be an incentive to lie. The paragraph leaves wide open essential facts such as; what day was the money pick up? Where did it occur? Who actually handled the money and how did Officer Carver know that it was drug proceeds? Moreover, the phrase "drug proceeds" is obviously a reference to money. If all Bostic is doing is laundering money, then search warrants of the residences in question would, of course, require different elements of proof than the proof required for a drug distribution charge.

TFO Compton does not write a corresponding paragraph in his affidavit. This exclusion is also a major omission on the part of TFO Compton. The failure to include Rodriguez-Gonzalez as a party as a co-conspirator is patently misleading. It leaves open the question of who is running the alleged organization. It severely weakens the Government's probable cause

because it appears that Bostic is more of a "bit player" than a leader organizer. In fact, Picos-Ochoa and Rodriguez-Gonzalez are acting completely independent of Bostic.

For an April 6, 2021 entry Agent Carver wrote the following:

> 12. On April 6, 2021, a DEA confidential source met with Picos-Ochoa in Indianapolis, Indiana, on an Indianapolis street corner and received a black backpack containing $124, 250 in U.S. Currency. (Ex. B).

TFO Compton stretches that single sentence into two and one-half pages in an attempt to tie in Bostic to Picos-Ochoa's money drop. The description of the event is extremely confusing and difficult to follow. However, one of the key discrepancies is that TFO Compton refers to a "black bag" which is a much different article than a black backpack. Additionally, TFO Compton refers to a neon yellow/green Nike drawstring bag without so much as any explanation of where it came from. There is no mention of a neon yellow/green drawstring bag in TFO Carver's affidavit and yet he is the person who ultimately took possession of the currency from Picos Ochoa. Finally, although TFO Compton has attempted to somehow tie Bostic to this money drop; the connection, if any, is that an Unknown Black Male (UBM) retrieved a black bag from a GMC Yukon registered to Andrene Sinclair while it was parked at 6142 Dado Drive. About one hour later Picos Ochoa allegedly took a brown duffle bag from the garage and placed it in the rear hatch of a Chrysler Pacifica. At 3:07 p.m. TFO Bonham observed Picos Ochoa exit the Chrysler Pacifica with a black backpack and grab the brown duffel bag. Picos Ochoa then entered 30 East Georgia Street. (By way of a key card). At 5:09 p.m. Picos Ochoa is seen leaving 30 E. Georgia St on foot with $125,000 and a yellow/green Nike drawstring bag. Picos Ochoa places the Nike bag into the Chrysler Pacifica and walks empty-handed to where CS 2 is parked. At 5:20 Picos-Ochoa gets into CS 2's vehicle and they "go mobile." At 5:25 Picos Ochoa gets out of CS 2's car and walks to the back hatch of the Chrysler Pacifica and obtains a black bag.

Picos Ochoa went back to CS 2's car and took a neon yellow/green Nike Drawstring bag from the black bag and put it in the passenger seat area. Picos Ochoa is observed placing the black bag in the Chrysler Pacifica. The money in the yellow/green Nike bag was counted and determined to be $124,250. (Ex. C, pp. 5-7).

The entirety of this portion of the affidavit of TFO Compton is intentionally misleading. The purpose of the deception is to tie Bostic to alleged criminal activity on the part of Picos Ochoa when in fact, there is no known connection. The Black bag, the Nike draw string bag, and the $124,500 have no connection to Bostic. Bostic has no known connection with 30 East Georgia Street. The Brown Duffel bag taken from his garage does not come into play in this transaction. It is blatant that TFO Compton is attempting to mislead the court into believing that Bostic had a part to play in this money drop. If TFO Compton had been candid about Bostic's lack of participation then a magistrate, presented with the warrant would certainly question Bostic's overall role in the alleged Drug Trafficking Organization.

TFO Compton described a driving pattern on April 15, 2021, as follows:

> On April 15, 2021, AS Collins identified Bostic driving a black Dodge Ram Truck … . During surveillance, Bostic met with PICOS OCHOA in Indianapolis. Surveillance officers observed Bostic drove in tandem with a gold Mercedes Indiana license plate 901DWB **all day**. (Emphasis added). Bostic driving the black Dodge Ram truck and the gold Mercedes drove northbound on I69, and surveillance was terminated in Anderson, around 2:45 p.m. While conducting surveillance in Fort Wayne later that afternoon around 4:30 p.m. DEA SA Howard Schneider observed the Mercedes license plate 901DWB, parked at 110 Riley Place, Fort Wayne, Indiana along with a black Dodge Ram Pickup Truck backed into the driveway Surveillance Officers located the gold Mercedes at the Lewis Street Grill. Through your Affiant's training and experience, it is common for drug dealers to have a second vehicle follow them to provide security for their drugs and/or money from rival drug dealers or from law enforcement.
>
> (Ex. C, pp. 7-8).

This paragraph is extremely misleading and intentionally so written. First of all, Bostic did not drive in tandem with Picos-Ochoa as could reasonably be inferred from the sentence

structure. Second, it would have been impossible for the Task Force Officers to observe Bostic driving in tandem with the Gold Mercedes "all day". The Task force terminated surveillance in Anderson, Indiana which is approximately 15 miles north of Indianapolis where surveillance was apparently initiated. Moreover, that Mercedes is not owned by Picos Ochoa and the surveillance officers knew this since they had recorded the plate number. That car is owned by a young man who occasionally helped with transporting restaurant supplies and food. The Task Force Officers surely knew that because DEA Special Agent Schneider saw the plate and recorded it. To make this paragraph more outrageous; Task Force Officer Compton surely knew this if he had done any kind of an investigation. Yet, he neglected to mention it in an effort to mislead the court and to make it appear as if Picos Ochoa was driving the gold Mercedes in an effort to "create a distraction" if officers attempted to stop Bostic.

Bostic did not drive in tandem with Picos-Ochoa and he did not drive in tandem with the Gold Mercedes. Picos Ochoa did not drive the Gold Mercedes. It is not registered to him and it is not owned by him. Although the license plate is recorded the Affidavit intentionally does not say who the car is registered to on that date. Once again all of these misstatements, taken singularly or in combination, have the effect of disassembling the probable cause which TFO Compton attempts to put together.

TFO Matthew Carver's Affidavit contains the following paragraph:

> 13. On April 22, 2021, DEA seized $90,110 during a traffic stop of Picos-Ochoa after he was observed meeting with BOSTIC and receiving a black backpack that contained the U.S. Currency. (Ex. B).

TFO Compton's affidavit contains no entry for April 22, 2021. Ninety thousand dollars is not an inconsequential amount of money that should be overlooked. Ninety thousand dollars should raise many questions that a magistrate signing a tracking or a search warrant would ask.

If Bostic is actually paying Picos-Ochoa then it would tend to show that Picos-Ochoa is the head of a drug ring and not Bostic. Conversely, it could show or tend to show that Bostic and Picos-Ochoa were involved in a money laundering scheme that was totally unrelated to drugs. Such a scheme would carry a lesser penalty than a drug distribution scheme. Neither TFO Compton nor TFO Carver explain any of the circumstances under which the money was seized. This raises multiple questions pertaining to the legality of the stop; how did the DEA learn of the alleged money pick-up and even the place and time of the occurrence of the confiscation of the money. Especially concerning is how much time elapsed between the time Picos-Ochoa received the backpack and when the stop was made. Finally, was Picos-Ochoa followed the entire time after receiving the backpack or were there any intermediary stops. Either the file of TFO Carver is replete with oral evidence or the omission of any mention of the putative money exchange by TFO Compton is intentional. Because there are so many questions that arise from this stop, the omission of any mention of the stop by TFO Compton is misleading. Again, there are so many misleading statements, and omissions as well as outright incorrect statements that if the Affidavit had been fully and truthfully presented probable cause to go forward with the search would have been denied. This is especially true because these money pickups have absolutely noting to do with 110 Riley Place or 6019 Pine Meadows Lane

TFO Carver included in his affidavit this entry:

> 14. On April 29, 2021, surveillance observed BOSTIC meet with Picos-Ochoa and Rodriguez-Gonzalez at an Indianapolis hotel. BOSTIC entered the hotel with a large duffel bag and exited approximately two hours later without the bag. Shortly after BOSTIC left the hotel a DEA confidential source met with Picos-Ochoa outside the hotel and received a black backpack containing $180,080 in U.S. Currency. (Ex. B).

TFO Compton writes a corresponding April 29, 2021, entry in his Affidavit and adds a few details. However, he noticeably and intentionally leaves out an important detail. Namely,

that a man named Rodriguez-Gonzalez entered the hotel with Bostic and Picos-Ochoa. (Ex. C, p. 6).

This is again a major, flagrant and intentional omission. Rodriguez-Gonzalez is not mentioned leaving the hotel at any time. This could show or tend to show that Rodriguez-Gonzalez was the one who set up the "deal" or that the deal was between Rodriguez-Gonzalez, Picos-Ochoa and the CS. Bostic left the hotel, according to TFO Compton carrying only a small maroon bag. It is outrageous that the presence of Rodriguez-Gonzalez is again absent from the report of TFO Compton. It certainly would have raised many questions on the part of Magistrate Collins. Specifically, "who is this guy?" and "What is his role in all of this?". Those questions needed to be answered along with "is there any evidence to show that Bostic had anything whatsoever to do with this money drop?" TFO Compton obviously tries to eliminate those questions by intentionally leaving out the presence of Rodriguez-Gonzalez."

TFO Carver went on to write that:

> 15. On May 3, 2021, DEA seized $204,880 during a traffic stop of Picos-Ochoa and Rodriguez after the two targets departed the Indianapolis stash house. (Ex. B).

TFO Compton makes no mention of the May 3, 2021, seizure in his affidavit. This is yet another major omission. This was most certainly exculpatory evidence showing that Picos-Ochoa operated separately and independently of Bostic as did the ethereal Rodriguez-Gonzalez. Furthermore, if the "stash house" referenced by TFO Carver is a stash house located at 30 E. Georgia Street then it would also show or tend to show that Bostic had nothing to do with the $124,250 money drop on April 6, 2021. Regardless of the ownership of the "stash house" there is intentional concealment of important evidence on the part of TFO Compton. Just how important that information is cannot be determined until there is a hearing on this matter. Just as an example those questions include: who is Rodriguez-Gonzalez; what is his relationship

to Picos-Ochoa; and what if any is his relationship to Bostic? Had Magistrate Collins known of this as well as the full involvement of Rodriguez-Gonzalez in the April 29, 2021, money drop she once again would have seriously and thoroughly questioned these issues before signing any warrants. TFO Compton appears to be intentionally displaying only half of the relevant facts.

May 5, 2021. TFO Carver wrote the following entry:

> On May 5, 2021, a DEA confidential source met with Bostic in Fort Wayne, Indiana in a parking lot and received a black backpack containing $148,050 in U.S. Currency. The DEA confidential source and Bostic did not know each other, had never met each other previously, and had never spoke with each other by telephone or online previously. In my experience, and using common sense, someone with $148,050 in cash does not give that cash to an unknown person in a backpack, in a parking lot, unless the transaction is criminal in nature. (Ex. B).

TFO Compton also wrote about the alleged money drop of May 5, 2021. TFO Compton's Affidavit alleges that "a white Camaro" left 110 Riley Place at 10:51 a.m. on May 5, 2021. Another officer observed "the white Camaro" drive to the Planet Fitness parking lot at 1916 West Dupont Road, at approximately 11:30 a.m. Another Officer observed a male exit the driver's seat of the white Camaro and get a bag out of the trunk of the white Camaro at 11:44 a.m. Bostic[2] returned to the driver's seat at 11:45 a.m. CS 3 entered the White Camero and was given a bag of currency containing $148,500.00. After the money drop TFO Compton claims that Bostic drove directly to 6619 Pine Meadows, Fort Wayne, In. (Ex. C, p. 9).

First of all, the May 5, 2021, alleged money drop is, like all other alleged illegal activity, stale dated by the time of the execution of the search warrant on 110 Riley Place. The alleged money drop was more than eleven months old by the time of the execution of the Search Warrant.(the search of 110 Riley Place and 6019 Pine Meadows Lane took place 11 months later). Second, no reasonable person would believe that the money came from 110 Riley Place.

[2] It is unclear from the Affidavit when Bostic was "identified". It may have been while he was on the scene or it might have been well after the alleged drop took place and investigators were reviewing videos of the alleged drop.

It is undisputed that 110 Riley Place was the home of Bostic's girlfriend, Ms. Sinclair. On May 5, 2021, the Camaro left her residence at 10:51 a.m. Bostic did not arrive at Planet Fitness until 11:30 a.m.; 39 minutes after he departed 110 Riley Place. Google maps indicates the trip should take 9-10 minutes. The actual expended time of 39[3] minutes is more than 3.5 times longer than it should take. There is no mention that Bostic's car was followed. There is no mention of where Bostic went from the time he left 110 Riley Place until he got to Planet Fitness. Taking a TFO "Carveresq" approach to this conundrum, no experienced drug dealer is going to drive around with $148,500 in his vehicle longer than necessary. If Bostic is an experienced drug dealer, as the Government maintains, then he surely stopped somewhere to pick up the $148,500. The money was never at 110 Riley Place and simply being the home of Bostic's girlfriend is not probable cause to search that home. Moreover, Bostic is not identified until he is at the Planet Fitness Parking Lot. This leaves wide open the question of who set up the money drop to begin with. Finally, TFO Compton, never gave any indicia of CS 3's reliability or experience nor did he state whether CS 3 was a "professional" Confidential Source or whether CS 3 was receiving a benefit for his cooperation. The answers to these questions appear to be intentionally omitted and they have a strong bearing on the reliability of the CS's used in this case.

Based upon the description of the pullover stop of Jerry Watson on June 7, 2021, Bostic is never named by Watson as having any role in the transport of the $169,520, found in the backpack which was placed in the rear of the vehicle. Detective Compton asserts that Bostic drove by the scene of the stop twice. It strains credulity to think that Detective Compton or one of the officers working with him did not question Watson about the involvement of Bostic during the interview of Watson. If Watson implicated Bostic it would certainly be noted in the

[3] On Page 33 TFO Compton states that Bostic left 110 Riley Place 53 minutes before the money drop. This inconsistency is never explained. However, it further raises the question of exactly where was the money located. It is highly unlikely that it was located at 110 Riley Place.

probable cause affidavit. Conversely if Watson denied any knowledge of Bostic's involvement, then that is exculpatory evidence and the failure/omission to disclose it is a major *Brady* violation. It is also, at the very least, gross negligence not to include a denial of Bostic's involvement in the money shipment in the Affidavit and calls for the *Franks* Hearing to be conducted.

It is obvious that Watson was at some point questioned specifically about involvement of Bostic in the transportation of the money. Watson was questioned about the transport of the $169,520 found in the backpack at the Allen County Police Department. (Ex. C, pp. 10-11). Watson granted permission for investigators to review his cell phone. (Ex. C, p.12). Detective Compton observed that there were phone calls from 260-206-2348 before and during the stop. Detective Compton also observed that these phone calls came from contact name "D Bo 1". It is a gross omission for Detective Compton to fail to state the phone number 260-206-2348 has never been associated with Bostic before or since the June 7, 2021 traffic stop. It is totally beyond all belief to think that Detective Compton did not ask Jerry Watson if "D Bo 1" was Demetrius Bostic. If Watson had answered that question in the affirmative it would be used as evidence. However, if Watson answered in the negative it is exculpatory evidence and it would have been a gross omission to leave that information out of the affidavit. Furthermore, it is somewhat well known that Watson has a cousin who goes by the moniker "D Bo". (n.b. "D Bo" is a popular sobriquet among young black males ever since Ice Cube's movie "Friday. D Bo was the large man who was the bully of the neighborhood.) Again, there are obvious "holes" in TFO Compton's discovery. These "holes" are glaring omissions and need to be addressed at a *Frank's* hearing.

What is most troubling about the pullover of Watson and the phone number in question is that Task Force Officers must have questioned Watson about it but there is no mention of those questions in TFO Compton's affidavit. It also seems unfathomable that Task Force Officers did not trace that phone number back to the person to whom it was assigned yet, there is no mention of that in the affidavit. Once again, it appears that this issue led to exculpatory evidence that was intentionally omitted from the affidavit. The cumulative effect of these omissions certainly vitiates probable cause.

Detective Compton also writes that after June 7, 2021, Officers observed Watson's gray Ford Taurus parked in front of the Lewis Street Grill multiple times. The Detectives failed to mention that Watson was an employee of the Lewis Street Grill. (Ex. C, p. 13). Watson's frequent presence at the Lewis Street Grill is also noted on page 14 of Ex. C. Watson was an employee of the restaurant and that explains why he is there on a daily basis. The omission of including the fact that Watson was an employee of the Lewis Street Grill is an omission that was deliberately or recklessly omitted from the Probable Cause Affidavit.

Next Detective Compton makes a spurious attempt at persuading the Court that Bostic engaged in drug related activity on June 19, 2021, when he travelled to Chicago. Bostic travelled to a hotel located at the O'Hare airport and stayed overnight. According to the Probable Cause Affidavit on page 12 (Ex. C), this is the same "area" where Watson was going to go when he was stopped (but apparently never arrested), on June 7, 2021. In fact, Bostic did travel to the area of O'Hare Airport and stay overnight. Bostic and a friend went to the outlet stores located there and shopped. Bostic's phone had ping warrants on it at this time. TFO Compton must have known his exact location but has intentionally failed to include it in his affidavit. Bostic and his friend returned to Noblesville, Indiana on June 20, 2021. It is easy to pinpoint where Bostic went

on June 19, 2021. The May 10, 2021 Tracking Warrant applied for by TFO Carver would have revealed where Bostic was. However, Detective Compton does not include this information. The reason can only be that it would show that the two trips had no commonality. It was again, reckless for Detective Compton to include this false conclusion in his Affidavit.

Next, Detective Compton speculates that Bostic's route of travel from Chicago to Noblesville on June 20, 2021, was circuitous and therefore suspicious. (Ex. C, pp. 12-13). Since this is simply speculation on the part of Detective Compton, without any evidence to back it up; Bostic makes no reply to it.

Detective Compton next notes, that after the traffic stop of June 7, 2021, Watson continued to park at the Lewis Street Grill on a daily basis and concludes that Watson is still operating "within the Bostic Drug Trafficking Organization. (Ex. C, p. 13). Once again this is reckless speculation on the part of Detective Compton. At this point in the investigation Detective Compton knew that Watson was an employee of the Lewis Street Grill and that he reported to work on a daily basis. After all, he is a detective. He certainly must have asked Watson where he worked. It is impossible to believe that detectives from the DEA and FBI were watching Bostic for all these months and did not know that Jerry Watson was an employee of the Lewis Street Grill. The failure to note that Watson was an employee of the Lewis Street Grill is a serious omission and the information is withheld in reckless disregard for the truth. Furthermore, had it been revealed that Watson was an employee of the Lewis Street Grill all of his "travel" would have been beyond "suspicion" when considered by Magistrate Judge Collins when she signed the search warrants.

On page 14 of his Affidavit, Officer Compton continues spreading specious, spurious, speculation. He writes that since he could not trace Bostic's phone 260-557-9243, Bostic

"dropped" his phone because it was compromised. He further states this is a common practice among drug dealers. Apparently, Officer Compton has a cell phone provided by the Fort Wayne Police Department which is part of a long-term contract. TFO Compton seems to be unaware that it is also common practice for consumers to switch phone services when they obtain a better deal from another provider. Once again, Detective Compton is engaging in reckless speculation with no factual background. TFO Compton continually attempts to twist these common occurrences into criminal activity through specious arguments that are without merit.

The Affidavit then describes a conversation that Detective Compton had with CI 783 regarding drug activity at the Lewis Street Grill. CI 783 allegedly made a series of statements which seem to be aimed only at obtaining a search warrant for residences associated with Bostic as well as the Lewis Street Grill. It is nearly impossible to believe that this CI had information pertaining to Bostic and a Mexican Cartel. Surely, with the DEA and other agencies involved in this investigation any connection with a Mexican Cartel would have been discovered without the use of a phantom CI that cannot come out of the closet to testify. More importantly for present purposes is that Detective Compton does not even make any notation whatsoever of how or why this CI has a factual basis for making these allegations. As such the entire description of the October 12, 2021 interview (Ex. C, p. 14), is nothing but reckless speculation. The allegations of CI 783 should never have been included in the affidavit since this person cannot be identified let alone be cross-examined. Accordingly, this information should never have been included in the affidavit since it cannot be verified. Its only purpose was to increase the probability that Judge Collins would sign the warrant.

From the last paragraph on page 13 of the affidavit and continuing to the last paragraph on page 15, all references to Watson are based on Watson acting apparently on his own and there is no association with Bostic.

On October 19, 2021, Bostic was observed in an Enterprise Rental Car. (Ex. C, p. 15). Bostic's Father is the manager of the Enterprise Rental Car Agency on State Street in Fort Wayne. This gives Bostic the opportunity to rent vehicles at premium rates. TFO Compton must have learned this fact while investigating Bostic. Bostic is also observed driving to "several" residences in Fort Wayne using "counter-surveillance" techniques before going to the residences. Once again there is no basis for claiming that Bostic employed counter-surveillance techniques. How many residences did he visit? Two? Three? More? On which streets did he drive to use his counter-surveillance tactics? Was there a possibility that he could have parked directly in front of these unknown residences? Was he free from one-way traffic so that he could enter the street without driving around the block? Again, there is a total lack of any detail to back up these allegations. There is no evidence to support any form of countersurveillance. Again, the Affidavit is filled with reckless speculation on the part of the Author to explain ordinary daily events that everyone encounters.

Bostic is tracked on December 3, 2021 driving to Detroit and returning. (Ex. C, p. 17). Through much of the trip Bostic is alleged to be travelling in tandem with Jerry Watson. The tracking culminates by concluding that the surveillance vehicles did not see any transactions occur. Then Watson and Bostic returned to the Lewis Street Grill.

While the DEA and the Allen County Drug Task Force are surveilling Watson on December 13, 2021, (Ex. C, p. 18), it is noted that Bostic turned off his phone. Detective Compton once again recklessly speculates that this occurs because Bostic is committing illegal

activity. Perhaps it is because his phone battery was about to run out of power, or perhaps he switched to another phone. After all, it is alleged that he has four phones. Or, it could well be that he just didn't want to be disturbed. The point is, there are no facts whatsoever that support the speculation that this occurred while committing criminal activity.

Detective Compton then describes how Bostic in his Yukon, Watson in his Silverado and a white van with an unnamed driver travel from 4505 Atwood Drive to the Walmart Supercenter in Anderson Indiana. (Ex. C, pp. 18-19). Undercover officers locate the three vehicles in the middle of the parking lot and coincidently three male subjects standing outside the vehicles. The three arrived at Walmart at 7:10. The driver of the van went into the Walmart. Watson returned to Fort Wayne. Bostic and the unknown driver of the van went to Buffalo Wild Wings and then left southbound on I69 toward Indianapolis. While there is no criminal activity observed, not so much as even a traffic violation, Detective Compton, with reckless abandon speculates the use of multiple vehicles was an *indicia* of criminal activity. This is total and sheer conjecture and Bostic is confident that no magistrate would ever sign on a warrant based on this "pitch". However, at the same time it does demonstrate that TFO Compton will go to any length to obtain a search warrant.

Once again, Detective Compton recklessly speculates that Bostic engaged in counter-surveillance on January 13, 2022 when he left "the residence" at 6619 Pine Meadows Lane and stopped at the Kroger Parking lot off St. Joe Center Road for 2 minutes. (Ex. C, p. 22). This is not only reckless speculation it boarders on the ridiculous. There could be 100 explanations for why someone would stop in a parking lot for 2 minutes to make a cell phone call; to tune in a better radio station; to check whatever Bostic brought from his house and make sure he didn't forget something – just to name a few. Claiming this to be counter-surveillance is speculative at

best – claiming it to be counter-surveillance associated with some criminal activity is even more rampant and more reckless. In the first thirty-nine pages of the affidavit this is one of three times that 6619 Pine Meadows Lane is even mentioned. There is no evidence that drug activity was taking place there.

From pages 23 through 33 neither 110 Riley Place nor 6619 Pine Meadows Lane are involved directly in any criminal activity. For that matter, there is no indirect involvement in criminal activity emanating from these addresses. Pages 23 through 33 primarily concern speculation on the suspiciousness of Bostic's travels to and from California, Neveda and New York. There are also intra-state travels which Detective Compton speculates are drug related. Detective Compton must have known that Bostic had a restaurant inside the Marathon Gas Station 1629 Raible Drive, Anderson Indiana. The existence of the restaurant explains why Bostic was seen there often with other Acquaintances. It also explains the trips to Gordon Food Services and to Walmart.

The Author of the Search Warrant Affidavits alleges that through physical and electronic surveillance he has determined that Bostic's primary residence is 110 Riley Place, Fort Wayne. He makes this allegation because he claims that Bostic was observed there on "almost" a weekly basis. This is a flagrant exaggeration; it is false; it is misleading and even if it were true, (which it isn't), being somewhere on a weekly basis hardly qualifies as a foundational information to claim that place as a "primary residence." Especially considering the fact that Bostic's Lady Friend lived there on a full-time basis.

During the entire course of the surveillance of Bostic; 110 Riley Place is only mentioned on a few occasions. TFO Compton believes that probable cause for the search of that residence is properly stated in Exhibit C, pp 33-34 of his affidavit.

**Probable Cause For 110 Riley Place, Fort Wayne, Indiana**

1. Bostic's has been observed at 110 Riley Place on an "almost weekly" basis. Bostic would argue that if someone stops at residence once a week it is probably not that person's primary residence.
2. On May 5, 2021, surveillance Officers observed Bostic leave 110 Riley Place, Fort Wayne, Indiana 53 minutes before the money drop $148,500.00 at Planet Fitness. For the reasons stated herein, that 53 minutes is the major reason to believe 110 Riley Place has nothing to do with any illegal business.
3. Members of the DEA and the Allen County Drug Task Force have observed vehicles that Bostic has been driving parked at the residence and as recently as March 19, 2022 Bostic's phone was "pinging" in the area of 110 Riley Place. This last "fact" is worth nothing. What does "in the area of 110 Riley Place mean?" Does it mean within a mile? Within the same area code? Within the county? It is useless information and was only meant to mislead and confuse the reader of the affidavit into believing that Bostic was living at 110 Riley Place regularly. If that statement was made as a part of a direct or cross examination of a witness it would be objected to as overly broad, vague and ambiguous and that objection would be sustained.

There has been no criminal activity associated with the residence located at 110 Riley Place, Fort Wayne including the money drop of May 5, 2021. Even assuming, *arguendo*, that it involved illegal activity, it most certainly did not include 110 Riley Place.

**Probable Cause for 6619 Pine Meadows Lane Fort Wayne, Indiana**

TFO Compton mentions 6619 Pine Meadows Lane, Fort Wayne, Indiana on two occasions in his forty-four page affidavit.

TFO Compton alleges that after June 7, 2021, Bostic drove by the pullover of Jerry Watson several times and then drove to 6619 Pine Meadows Lane. (Ex. C, p. 11). 6619 Pine Meadows Lane is again mentioned on page 22 of TFO Compton's Affidavit. He writes that Bostic was there on January 13 and he apparently had a garage door opener. It also brings back up the June 7, 2021 pullover of Watson, and Bostic going back to 6619 Pine Meadows lane. Apparently, Bostic was seen there only twice in in a sixth month period. On February 2, 2022 Bostic's truck was tracked to 6619 Pine Meadows Lane and it stayed there overnight. On February 4, 2022 Bostic's Truck was tracked to 6619 Pine Meadows Lane and stayed there for only 6 minutes. Without any details, Officer Compton notes that Bostic has been followed to and from the Lewis Street Grill routinely. It is unclear from the affidavit whether the trips to the Lewis Street Grill originate from 6619 Pine Meadows Place. (Ex. C, p. 26). On February 7, 2022, Bostic drove his truck from 6619 Pine Meadows Place to the Kroger Parking lot where he allegedly place a package into a red passenger car. (Ex. C, p. 27). On March 1, 2022 Bostic was seen backing out of 6619 Pine Meadow Lane. (Ex C, p. 28).

Over the course of the entire investigation of some 14 months Bostic's vehicle is brought up, in connection with 6619 Pine Meadows Lane, on 7 specific dates. (An average one every two months). Not once are any of the dates mentioned associated with specific criminal activity. Watson was never charged for any criminal acts on the June 7, 2021 pullover. Watson apparently never implicated Bostic as having any interest in the money found in the van. (It is still hard to believe that TFO Compton did not question him about Bostic's pecuniary interest in the money found.) The only other allegedly suspicious activity is putting a package in a red vehicle in the Kroger Parking lot. There is no allegation whatsoever that the "package" was ever in 6619 Pine Meadows nor is there any specific allegation that it contained contraband.

The Probable Cause, contained in TFO Compton's Affidavit for the search of 6619 Pine Meadows Lane is even less than that of the Probable cause for 110 Riley.

**Conclusion**

TFO Compton's failure to even mention Rodriguez-Gonzalez constitutes at least three intentional omissions that affect culpability of Mr. Bostic. TFO Compton's failure to even discuss the questions asked to Mr. Watson after the June 7, 2021 pullover where Watson was transporting $169,520 in the back of a Sprinter Van, is clearly another major omission. The fact that he spotted a phone contact named "D BO 1" is a dead give away that the pullover centered around the connection, if any, of the money found in the truck to Bostic. However, none of Watson's responses to questions posed to him after the stop are reflected in the Affidavit. This is another deliberate attempt to obscure the non-role of Bostic in this money transportation. TFO Compton also states that Bostic was followed to 6619 Pine Meadows Drive when he left the area. This is also a misstatement that was intentional. The DEA's own notes indicate that Bostic first went to a restaurant adjacent to the Glenbrook Mall. If the Court allows a hearing on this matter Bostic can prove his route of travel. Again, this is not a minute omission. This is a deliberate attempt to gloss over and omit facts in order to obtain the search warrant. Likewise, the May 5, 2021 "money drop" also contains an omission. Namely that Bostic did not travel from 110 Riley Place directly to Planet Fitness. Bostic believes he can prove this too if the court conducts a *Franks* hearing.

The other issue which was apparently obscured by the probable cause affidavit is the lack of nexus between the alleged criminal activity and 110 Riley Place (Ms. Andrene' Sinclair's Residence). Similarly there is very little if any nexus between the alleged criminal activity and 6019 Pine Valley Lane.

Finally, even if all the money laundering claims are true, there is no evidence whatsoever that it is connected to drug dealing.

Even if the Court were to find that none of the individual, patent, omissions or misstatements contained in the affidavit warrant a *Franks* hearing. The cumulative effect of all of these intentional omissions and misstatements is more than enough to hold that probable cause to search 110 Riley Place and 6019 Pine Valley Lane was lacking without them.

For all of the forging reasons Bostic asks this Court to schedule this matter for a *Franks* Hearing pertaining to the search of 110 Riley Place and 6619 Pine Meadows Lane.

Respectfully submitted,

*/s/ Thomas N. O'Malley*
Thomas N. O'Malley

**CERTIFICATE OF SERVICE**

I hereby certify that, on October 6, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notifications of such filing to all parties of record.

*/s/ Thomas N. O'Malley*
Thomas N. O'Malley